Chief Justice ROBERTS delivered the opinion of the Court.
*2251 The Montana Legislature established a program to provide tuition assistance to parents who send their children to private schools. The program grants a tax credit to anyone who donates to certain organizations that in turn award scholarships to selected students attending such schools. When petitioners sought to use the scholarships at a religious school, the Montana Supreme Court struck down the program. The Court relied on the "no-aid" provision of the State Constitution, which prohibits any aid to a school controlled by a "church, sect, or denomination." The question presented is whether the Free Exercise Clause of the United States Constitution barred that application of the no-aid provision.
I
A
In 2015, the Montana Legislature sought "to provide parental and student choice in education" by enacting a scholarship program for students attending private schools. 2015 Mont. Laws p. 2168, § 7. The program grants a tax credit of up to $150 to any taxpayer who donates to a participating "student scholarship organization." Mont. Code Ann. §§ 15-30-3103(1), - 3111(1) (2019). The scholarship organizations then use the donations to award scholarships to children for tuition at a private school. §§ 15-30-3102(7)(a), -3103(1)(c).[1]
So far only one scholarship organization, Big Sky Scholarships, has participated in the program. Big Sky focuses on providing scholarships to families who face financial hardship or have children with disabilities. Scholarship organizations like Big Sky must, among other requirements, maintain an application process for awarding the scholarships; use at least 90% of all donations on scholarship awards; and comply with state reporting and monitoring requirements. §§ 15-30-3103(1), - 3105(1), - 3113(1).
A family whose child is awarded a scholarship under the program may use it at any "qualified education provider"-that is, any private school that meets certain accreditation, testing, and safety requirements. See § 15-30-3102(7). Virtually every private school in Montana qualifies. Upon receiving a scholarship, the family designates its school of choice, and the scholarship organization sends the scholarship funds directly to the school. § 15-30-3104(1). Neither the scholarship organization nor its donors can restrict awards to particular types of schools. See §§ 15-30-3103(1)(b), - 3111(1).
The Montana Legislature allotted $3 million annually to fund the tax credits, beginning in 2016. § 15-30-3111(5)(a). If the annual allotment is exhausted, it increases by 10% the following year. Ibid.
*2252 The program is slated to expire in 2023. 2015 Mont. Laws p. 2186, § 33.
The Montana Legislature also directed that the program be administered in accordance with Article X, section 6, of the Montana Constitution, which contains a "no-aid" provision barring government aid to sectarian schools. See Mont. Code Ann. § 15-30-3101. In full, that provision states:
"Aid prohibited to sectarian schools. ... The legislature, counties, cities, towns, school districts, and public corporations shall not make any direct or indirect appropriation or payment from any public fund or monies, or any grant of lands or other property for any sectarian purpose or to aid any church, school, academy, seminary, college, university, or other literary or scientific institution, controlled in whole or in part by any church, sect, or denomination." Mont. Const., Art. X, § 6 (1).
Shortly after the scholarship program was created, the Montana Department of Revenue promulgated "Rule 1," over the objection of the Montana Attorney General. That administrative rule prohibited families from using scholarships at religious schools. Mont. Admin. Rule § 42.4.802(1)(a) (2015). It did so by changing the definition of "qualified education provider" to exclude any school "owned or controlled in whole or in part by any church, religious sect, or denomination." Ibid. The Department explained that the Rule was needed to reconcile the scholarship program with the no-aid provision of the Montana Constitution.
The Montana Attorney General disagreed. In a letter to the Department, he advised that the Montana Constitution did not require excluding religious schools from the program, and if it did, it would "very likely" violate the United States Constitution by discriminating against the schools and their students. See Complaint in No. DV-15-1152A (Dist. Ct. Flathead Cty.), Exh. 3, pp. 2, 5-6. The Attorney General is not representing the Department in this case.
B
This suit was brought by three mothers whose children attend Stillwater Christian School in northwestern Montana. Stillwater is a private Christian school that meets the statutory criteria for "qualified education providers." It serves students in prekindergarten through 12th grade, and petitioners chose the school in large part because it "teaches the same Christian values that [they] teach at home." App. to Pet. for Cert. 152; see id. , at 138, 167. The child of one petitioner has already received scholarships from Big Sky, and the other petitioners' children are eligible for scholarships and planned to apply. While in effect, however, Rule 1 blocked petitioners from using scholarship funds for tuition at Stillwater. To overcome that obstacle, petitioners sued the Department of Revenue in Montana state court. Petitioners claimed that Rule 1 conflicted with the statute that created the scholarship program and could not be justified on the ground that it was compelled by the Montana Constitution's no-aid provision. Petitioners further alleged that the Rule discriminated on the basis of their religious views and the religious nature of the school they had chosen for their children.
The trial court enjoined Rule 1, holding that it was based on a mistake of law. The court explained that the Rule was not required by the no-aid provision, because that provision prohibits only "appropriations" that aid religious schools, "not tax credits." Id. , at 94.
The injunctive relief freed Big Sky to award scholarships to students regardless of whether they attended a religious or secular school. For the school year beginning *2253 in fall 2017, Big Sky received 59 applications and ultimately awarded 44 scholarships of $500 each. The next year, Big Sky received 90 applications and awarded 54 scholarships of $500 each. Several families, most with incomes of $30,000 or less, used the scholarships to send their children to Stillwater Christian.
In December 2018, the Montana Supreme Court reversed the trial court. 393 Mont. 446, 435 P.3d 603. The Court first addressed the scholarship program unmodified by Rule 1, holding that the program aided religious schools in violation of the no-aid provision of the Montana Constitution. In the Court's view, the no-aid provision "broadly and strictly prohibits aid to sectarian schools." Id. , at 459, 435 P.3d at 609. The scholarship program provided such aid by using tax credits to "subsidize tuition payments" at private schools that are "religiously affiliated" or "controlled in whole or in part by churches." Id. , at 464-467, 435 P.3d at 612-613. In that way, the scholarship program flouted the State Constitution's "guarantee to all Montanans that their government will not use state funds to aid religious schools." Id. , at 467, 435 P.3d at 614.
The Montana Supreme Court went on to hold that the violation of the no-aid provision required invalidating the entire scholarship program. The Court explained that the program provided "no mechanism" for preventing aid from flowing to religious schools, and therefore the scholarship program could not "under any circumstance" be construed as consistent with the no-aid provision. Id. , at 466-468, 435 P.3d at 613-614. As a result, the tax credit is no longer available to support scholarships at either religious or secular private schools.
The Montana Supreme Court acknowledged that "an overly-broad" application of the no-aid provision "could implicate free exercise concerns" and that "there may be a case" where "prohibiting the aid would violate the Free Exercise Clause." Id. , at 468, 435 P.3d at 614. But, the Court concluded, "this is not one of those cases." Ibid.
Finally, the Court agreed with petitioners that the Department had exceeded its authority in promulgating Rule 1. The Court explained that the statute creating the scholarship program had broadly defined qualifying schools to include all private schools, including religious ones, and the Department lacked authority to "transform" that definition with an administrative rule. Id. , at 468-469, 435 P.3d at 614-615.
Several Justices wrote separately. All agreed that Rule 1 was invalid, but they expressed differing views on whether the scholarship program was consistent with the Montana and United States Constitutions. Justice Gustafson's concurrence argued that the program violated not only Montana's no-aid provision but also the Federal Establishment and Free Exercise Clauses. Id. , at 475-479, 435 P.3d at 619-621. Justice Sandefur echoed the majority's conclusion that applying the no-aid provision was consistent with the Free Exercise Clause, and he dismissed the "modern jurisprudence" of that Clause as "unnecessarily complicate[d]" due to "increasingly value-driven hairsplitting and overstretching." Id. , at 482-484, 435 P.3d at 623-624.
Two Justices dissented. Justice Rice would have held that the scholarship program was permissible under the no-aid provision. He criticized the majority for invalidating the program "sua sponte ," contending that no party had challenged it under the State Constitution. Id. , at 495, 435 P.3d at 631. Justice Baker also would have upheld the program. In her view, the no-aid provision did not bar the use of *2254 scholarships at religious schools, and free exercise concerns could arise under the Federal Constitution if it did. Id. , at 493-494, 435 P.3d at 630.
We granted certiorari. 588 U.S. ----, 139 S.Ct. 2777, 204 L.Ed.2d 1157 (2019).
II
A
The Religion Clauses of the First Amendment provide that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." We have recognized a " 'play in the joints' between what the Establishment Clause permits and the Free Exercise Clause compels." Trinity Lutheran Church of Columbia, Inc. v. Comer , 582 U.S. ----, ----, 137 S.Ct. 2012, 2019, 198 L.Ed.2d 551 (2017) (quoting Locke v. Davey , 540 U.S. 712, 718, 124 S.Ct. 1307, 158 L.Ed.2d 1 (2004) ). Here, the parties do not dispute that the scholarship program is permissible under the Establishment Clause. Nor could they. We have repeatedly held that the Establishment Clause is not offended when religious observers and organizations benefit from neutral government programs. See, e.g. , Locke , 540 U.S. at 719, 124 S.Ct. 1307 ; Rosenberger v. Rector and Visitors of Univ. of Va. , 515 U.S. 819, 839, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). See also Trinity Lutheran , 582 U.S., at ----, 137 S.Ct., at 2019-2020 (noting the parties' agreement that the Establishment Clause was not violated by including churches in a playground resurfacing program). Any Establishment Clause objection to the scholarship program here is particularly unavailing because the government support makes its way to religious schools only as a result of Montanans independently choosing to spend their scholarships at such schools. See Locke , 540 U.S. at 719, 124 S.Ct. 1307 ; Zelman v. Simmons-Harris , 536 U.S. 639, 649-653, 122 S.Ct. 2460, 153 L.Ed.2d 604 (2002). The Montana Supreme Court, however, held as a matter of state law that even such indirect government support qualified as "aid" prohibited under the Montana Constitution.
The question for this Court is whether the Free Exercise Clause precluded the Montana Supreme Court from applying Montana's no-aid provision to bar religious schools from the scholarship program. For purposes of answering that question, we accept the Montana Supreme Court's interpretation of state law-including its determination that the scholarship program provided impermissible "aid" within the meaning of the Montana Constitution-and we assess whether excluding religious schools and affected families from that program was consistent with the Federal Constitution.[2]
The Free Exercise Clause, which applies to the States under the Fourteenth Amendment, "protects religious observers against unequal treatment" and against "laws that impose special disabilities on the basis of religious status." Trinity Lutheran , 582 U.S., at ----, ----, 137 S.Ct., at 2021 (internal quotation marks and alterations omitted); see Cantwell v. Connecticut , 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). Those "basic principle[s]" have long guided this Court. Trinity Lutheran , 582 U.S., at ---- - ----, 137 S.Ct. at 2019-2021. See, e.g. , *2255 Everson v. Board of Ed. of Ewing , 330 U.S. 1, 16, 67 S.Ct. 504, 91 L.Ed. 711 (1947) (a State "cannot exclude individual Catholics, Lutherans, Mohammedans, Baptists, Jews, Methodists, Non-believers, Presbyterians, or the members of any other faith, because of their faith, or lack of it , from receiving the benefits of public welfare legislation"); Lyng v. Northwest Indian Cemetery Protective Assn. , 485 U.S. 439, 449, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988) (the Free Exercise Clause protects against laws that "penalize religious activity by denying any person an equal share of the rights, benefits, and privileges enjoyed by other citizens").
Most recently, Trinity Lutheran distilled these and other decisions to the same effect into the "unremarkable" conclusion that disqualifying otherwise eligible recipients from a public benefit "solely because of their religious character" imposes "a penalty on the free exercise of religion that triggers the most exacting scrutiny." 582 U.S., at ---- - ----, 137 S.Ct., at 2021. In Trinity Lutheran , Missouri provided grants to help nonprofit organizations pay for playground resurfacing, but a state policy disqualified any organization "owned or controlled by a church, sect, or other religious entity." Id. , at ----, 137 S.Ct., at 2017. Because of that policy, an otherwise eligible church-owned preschool was denied a grant to resurface its playground. Missouri's policy discriminated against the Church "simply because of what it is-a church," and so the policy was subject to the "strictest scrutiny," which it failed. Id. , at ---- - ----, 137 S.Ct., at 2022-2025. We acknowledged that the State had not "criminalized" the way in which the Church worshipped or "told the Church that it cannot subscribe to a certain view of the Gospel." Id. , at ----, 137 S.Ct., at 2022. But the State's discriminatory policy was "odious to our Constitution all the same." Id. , at ----, 137 S.Ct., at 2025.
Here too Montana's no-aid provision bars religious schools from public benefits solely because of the religious character of the schools. The provision also bars parents who wish to send their children to a religious school from those same benefits, again solely because of the religious character of the school. This is apparent from the plain text. The provision bars aid to any school "controlled in whole or in part by any church, sect, or denomination." Mont. Const., Art. X, § 6 (1). The provision's title-"Aid prohibited to sectarian schools"-confirms that the provision singles out schools based on their religious character. Ibid. And the Montana Supreme Court explained that the provision forbids aid to any school that is "sectarian," "religiously affiliated," or "controlled in whole or in part by churches." 393 Mont. at 464-467, 435 P.3d at 612-613. The provision plainly excludes schools from government aid solely because of religious status. See Trinity Lutheran , 582 U.S., at ---- - ----, 137 S.Ct., at 2019-2021.
The Department counters that Trinity Lutheran does not govern here because the no-aid provision applies not because of the religious character of the recipients, but because of how the funds would be used-for "religious education." Brief for Respondents 38. In Trinity Lutheran , a majority of the Court concluded that the Missouri policy violated the Free Exercise Clause because it discriminated on the basis of religious status. A plurality declined to address discrimination with respect to "religious uses of funding or other forms of discrimination." 582 U.S., at ----, n. 3, 137 S.Ct., at 2024, n. 3. The plurality saw no need to consider such concerns because Missouri had expressly discriminated "based on religious identity," ibid. , which was enough to invalidate the state policy *2256 without addressing how government funds were used.
This case also turns expressly on religious status and not religious use. The Montana Supreme Court applied the no-aid provision solely by reference to religious status. The Court repeatedly explained that the no-aid provision bars aid to "schools controlled in whole or in part by churches," "sectarian schools," and "religiously-affiliated schools." 393 Mont. at 463-467, 435 P.3d at 611-613. Applying this provision to the scholarship program, the Montana Supreme Court noted that most of the private schools that would benefit from the program were "religiously affiliated" and "controlled by churches," and the Court ultimately concluded that the scholarship program ran afoul of the Montana Constitution by aiding "schools controlled by churches." Id. , at 466-467, 435 P.3d at 613-614. The Montana Constitution discriminates based on religious status just like the Missouri policy in Trinity Lutheran , which excluded organizations "owned or controlled by a church, sect, or other religious entity." 582 U.S., at ----, 137 S.Ct., at 2017.
The Department points to some language in the decision below indicating that the no-aid provision has the goal or effect of ensuring that government aid does not end up being used for "sectarian education" or "religious education." 393 Mont. at 460, 466-467, 435 P.3d at 609, 613-614. The Department also contrasts what it characterizes as the "completely non-religious" benefit of playground resurfacing in Trinity Lutheran with the unrestricted tuition aid at issue here. Tr. of Oral Arg. 31. General school aid, the Department stresses, could be used for religious ends by some recipients, particularly schools that believe faith should "permeate [ ]" everything they do. Brief for Respondents 39 (quoting State ex rel. Chambers v. School Dist. No. 10 , 155 Mont. 422, 438, 472 P.2d 1013, 1021 (1970) ). See also post , at 2285, 2288 (BREYER, J., dissenting).
Regardless, those considerations were not the Montana Supreme Court's basis for applying the no-aid provision to exclude religious schools; that hinged solely on religious status. Status-based discrimination remains status based even if one of its goals or effects is preventing religious organizations from putting aid to religious uses.
Undeterred by Trinity Lutheran , the Montana Supreme Court applied the no-aid provision to hold that religious schools could not benefit from the scholarship program. 393 Mont. at 464-468, 435 P.3d at 612-614. So applied, the provision "impose[s] special disabilities on the basis of religious status" and "condition[s] the availability of benefits upon a recipient's willingness to surrender [its] religiously impelled status." Trinity Lutheran , 582 U.S., at ---- - ----, 137 S.Ct., at 2021-2022 (quoting Church of Lukumi Babalu Aye, Inc. v. Hialeah , 508 U.S. 520, 533, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993), and McDaniel v. Paty , 435 U.S. 618, 626, 98 S.Ct. 1322, 55 L.Ed.2d 593 (1978) (plurality opinion) (alterations omitted)). To be eligible for government aid under the Montana Constitution, a school must divorce itself from any religious control or affiliation. Placing such a condition on benefits or privileges "inevitably deters or discourages the exercise of First Amendment rights." Trinity Lutheran , 582 U.S., at ----, 137 S.Ct., at 2022 (quoting Sherbert v. Verner , 374 U.S. 398, 405, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (alterations omitted)). The Free Exercise Clause protects against even "indirect coercion," and a State "punishe[s] the free exercise of religion" by disqualifying the religious from government aid as Montana did here.
*2257 Trinity Lutheran , 582 U.S., at ---- - ----, 137S.Ct., at 2022 (internal quotation marks omitted). Such status-based discrimination is subject to "the strictest scrutiny." Id. , at ----, 137 S.Ct., at 2022.
None of this is meant to suggest that we agree with the Department, Brief for Respondents 36-40, that some lesser degree of scrutiny applies to discrimination against religious uses of government aid. See Lukumi , 508 U.S. at 546, 113 S.Ct. 2217 (striking down law designed to ban religious practice involving alleged animal cruelty, explaining that a law "target[ing] religious conduct for distinctive treatment or advanc[ing] legitimate governmental interests only against conduct with a religious motivation will survive strict scrutiny only in rare cases"). Some Members of the Court, moreover, have questioned whether there is a meaningful distinction between discrimination based on use or conduct and that based on status. See Trinity Lutheran , 582 U.S., at ---- - ----, 137 S.Ct, at 2025 (GORSUCH, J., joined by THOMAS, J., concurring in part) (citing, e.g. , Lukumi , 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472, and Thomas v. Review Bd. of Ind. Employment Security Div. , 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981) ). We acknowledge the point but need not examine it here. It is enough in this case to conclude that strict scrutiny applies under Trinity Lutheran because Montana's no-aid provision discriminates based on religious status.
B
Seeking to avoid Trinity Lutheran , the Department contends that this case is instead governed by Locke v. Davey , 540 U.S. 712, 124 S.Ct. 1307, 158 L.Ed.2d 1 (2004). See also post , at 2283 - 2284 (BREYER, J., dissenting); post , at 2296 - 2297 (SOTOMAYOR, J., dissenting). Locke also involved a scholarship program. The State of Washington provided scholarships paid out of the State's general fund to help students pursuing postsecondary education. The scholarships could be used at accredited religious and nonreligious schools alike, but Washington prohibited students from using the scholarships to pursue devotional theology degrees, which prepared students for a calling as clergy. This prohibition prevented Davey from using his scholarship to obtain a degree that would have enabled him to become a pastor. We held that Washington had not violated the Free Exercise Clause.
Locke differs from this case in two critical ways. First, Locke explained that Washington had "merely chosen not to fund a distinct category of instruction": the "essentially religious endeavor" of training a minister "to lead a congregation." Id. , at 721, 124 S.Ct. 1307. Thus, Davey "was denied a scholarship because of what he proposed to do -use the funds to prepare for the ministry." Trinity Lutheran , 582 U.S., at ----, 137 S.Ct., at 2023-2024. Apart from that narrow restriction, Washington's program allowed scholarships to be used at "pervasively religious schools" that incorporated religious instruction throughout their classes. Locke , 540 U.S. at 724-725, 124 S.Ct. 1307. By contrast, Montana's Constitution does not zero in on any particular "essentially religious" course of instruction at a religious school. Rather, as we have explained, the no-aid provision bars all aid to a religious school "simply because of what it is," putting the school to a choice between being religious or receiving government benefits. Trinity Lutheran , 582 U.S., at ----, 137 S.Ct., at 2023. At the same time, the provision puts families to a choice between sending their children to a religious school or receiving such benefits.
Second, Locke invoked a "historic and substantial" state interest in not funding the training of clergy, *2258 540 U.S. at 725, 124 S.Ct. 1307, explaining that "opposition to ... funding 'to support church leaders' lay at the historic core of the Religion Clauses," Trinity Lutheran , 582 U.S., at ----, 137 S.Ct., at 2023 (quoting Locke , 540 U.S. at 722, 124 S.Ct. 1307 ). As evidence of that tradition, the Court in Locke emphasized that the propriety of state-supported clergy was a central subject of founding-era debates, and that most state constitutions from that era prohibited the expenditure of tax dollars to support the clergy. See id. , at 722-723, 124 S.Ct. 1307.
But no comparable "historic and substantial" tradition supports Montana's decision to disqualify religious schools from government aid. In the founding era and the early 19th century, governments provided financial support to private schools, including denominational ones. "Far from prohibiting such support, the early state constitutions and statutes actively encouraged this policy." L. Jorgenson, The State and the Non-Public School, 1825-1925, p. 4 (1987); e.g., R. Gabel, Public Funds for Church and Private Schools 210, 217-218, 221, 241-243 (1937); C. Kaestle, Pillars of the Republic: Common Schools and American Society, 1760-1860, pp. 166-167 (1983). Local governments provided grants to private schools, including religious ones, for the education of the poor. M. McConnell, et al., Religion and the Constitution 318-319 (4th ed. 2016). Even States with bans on government-supported clergy, such as New Jersey, Pennsylvania, and Georgia, provided various forms of aid to religious schools. See Kaestle, supra , at 166-167; Gabel, supra , at 215-218, 241-245, 372-374; cf. Locke , 540 U.S. at 723, 124 S.Ct. 1307. Early federal aid (often land grants) went to religious schools. McConnell, supra , at 319. Congress provided support to denominational schools in the District of Columbia until 1848, ibid. , and Congress paid churches to run schools for American Indians through the end of the 19th century, see Quick Bear v. Leupp , 210 U.S. 50, 78, 28 S.Ct. 690, 52 L.Ed. 954 (1908) ; Gabel, supra , at 521-523. After the Civil War, Congress spent large sums on education for emancipated freedmen, often by supporting denominational schools in the South through the Freedmen's Bureau. McConnell, supra , at 323.[3]
The Department argues that a tradition against state support for religious schools arose in the second half of the 19th century, as more than 30 States-including Montana-adopted no-aid provisions. See Brief for Respondents 40-42 and App. D.
*2259 Such a development, of course, cannot by itself establish an early American tradition. Justice SOTOMAYOR questions our reliance on aid provided during the same era by the Freedmen's Bureau, post , at 2297 (dissenting opinion), but we see no inconsistency in recognizing that such evidence may reinforce an early practice but cannot create one. In addition, many of the no-aid provisions belong to a more checkered tradition shared with the Blaine Amendment of the 1870s. That proposal-which Congress nearly passed-would have added to the Federal Constitution a provision similar to the state no-aid provisions, prohibiting States from aiding "sectarian" schools. See Mitchell v. Helms , 530 U.S. 793, 828, 120 S.Ct. 2530, 147 L.Ed.2d 660 (2000) (plurality opinion). "[I]t was an open secret that 'sectarian' was code for 'Catholic.' " Ibid. ; see Jorgenson, supra , at 70. The Blaine Amendment was "born of bigotry" and "arose at a time of pervasive hostility to the Catholic Church and to Catholics in general"; many of its state counterparts have a similarly "shameful pedigree." Mitchell , 530 U.S. at 828-829, 120 S.Ct. 2530 (plurality opinion); see Jorgenson, supra , at 69-70, 216; Jeffries & Ryan, A Political History of the Establishment Clause, 100 Mich. L. Rev. 279, 301-305 (2001). The no-aid provisions of the 19th century hardly evince a tradition that should inform our understanding of the Free Exercise Clause.
The Department argues that several States have rejected referendums to overturn or limit their no-aid provisions, and that Montana even re-adopted its own in the 1970s, for reasons unrelated to anti-Catholic bigotry. See Brief for Respondents 20, 42. But, on the other side of the ledger, many States today-including those with no-aid provisions-provide support to religious schools through vouchers, scholarships, tax credits, and other measures. See Brief for Oklahoma et al. as Amici Curiae 29-31, 33-35; Brief for Petitioners 5. According to petitioners, 20 of 37 States with no-aid provisions allow religious options in publicly funded scholarship programs, and almost all allow religious options in tax credit programs. Reply Brief 22, n. 9.
All to say, we agree with the Department that the historical record is "complex." Brief for Respondents 41. And it is true that governments over time have taken a variety of approaches to religious schools. But it is clear that there is no "historic and substantial" tradition against aiding such schools comparable to the tradition against state-supported clergy invoked by Locke .
C
Two dissenters would chart new courses. Justice SOTOMAYOR would grant the government "some room" to "single ... out" religious entities "for exclusion," based on what she views as "the interests embodied in the Religion Clauses." Post, at 2295 - 2296, 2296 (quoting Trinity Lutheran , 582 U.S., at ----, ----, 137 S.Ct., at 2031 (SOTOMAYOR, J., dissenting)). Justice BREYER, building on his solo opinion in Trinity Lutheran , would adopt a "flexible, context-specific approach" that "may well vary" from case to case. Post , at 2288, 2290; see Trinity Lutheran , 582 U.S., at ----, 137 S.Ct., at 2026-2027 (BREYER, J., concurring in judgment). As best we can tell, courts applying this approach would contemplate the particular benefit and restriction at issue and discern their relationship to religion and society, taking into account "context and consequences measured in light of [the] purposes" of the Religion Clauses. Post , at 2291 - 2292 (quoting Van Orden v. Perry , 545 U.S. 677, 700, 125 S.Ct. 2854, 162 L.Ed.2d 607 (2005) (BREYER, J., concurring in judgment)). What is clear is that *2260 Justice BREYER would afford much freer rein to judges than our current regime, arguing that "there is 'no test-related substitute for the exercise of legal judgment.' " Post , at 2291 (quoting Van Orden , 545 U.S. at 700, 125 S.Ct. 2854 (opinion of BREYER, J.)).
The simplest response is that these dissents follow from prior separate writings, not from the Court's decision in Trinity Lutheran or the decades of precedent on which it relied. These precedents have "repeatedly confirmed" the straightforward rule that we apply today: When otherwise eligible recipients are disqualified from a public benefit "solely because of their religious character," we must apply strict scrutiny. Trinity Lutheran , 582 U.S., at ---- - ----, 137 S.Ct, at 2021. This rule against express religious discrimination is no "doctrinal innovation." Post , at 2288 (opinion of BREYER, J.). Far from it. As Trinity Lutheran explained, the rule is "unremarkable in light of our prior decisions." 582 U.S., at ----, 137 S.Ct., at 2021.
For innovation, one must look to the dissents. Their "room[y]" or "flexible" approaches to discrimination against religious organizations and observers would mark a significant departure from our free exercise precedents. The protections of the Free Exercise Clause do not depend on a "judgment-by-judgment analysis" regarding whether discrimination against religious adherents would somehow serve ill-defined interests. Cf. Medellín v. Texas , 552 U.S. 491, 514, 128 S.Ct. 1346, 170 L.Ed.2d 190 (2008).
D
Because the Montana Supreme Court applied the no-aid provision to discriminate against schools and parents based on the religious character of the school, the "strictest scrutiny" is required. Supra , at 2255, 2257 (quoting Trinity Lutheran , 582 U.S., at ----, 137 S.Ct., at 2022 ). That "stringent standard," id., at ----, 137 S.Ct., at 2024, is not "watered down but really means what it says," Lukumi , 508 U.S. at 546, 113 S.Ct. 2217 (internal quotation marks and alterations omitted). To satisfy it, government action "must advance 'interests of the highest order' and must be narrowly tailored in pursuit of those interests." Ibid. (quoting McDaniel , 435 U.S. at 628, 98 S.Ct. 1322 ).
The Montana Supreme Court asserted that the no-aid provision serves Montana's interest in separating church and State "more fiercely" than the Federal Constitution. 393 Mont. at 467, 435 P.3d at 614. But "that interest cannot qualify as compelling" in the face of the infringement of free exercise here. Trinity Lutheran , 582 U.S., at ----, 137 S.Ct., at 2024. A State's interest "in achieving greater separation of church and State than is already ensured under the Establishment Clause ... is limited by the Free Exercise Clause." Ibid. (quoting Widmar v. Vincent , 454 U.S. 263, 276, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) ).
The Department, for its part, asserts that the no-aid provision actually promotes religious freedom. In the Department's view, the no-aid provision protects the religious liberty of taxpayers by ensuring that their taxes are not directed to religious organizations, and it safeguards the freedom of religious organizations by keeping the government out of their operations. See Brief for Respondents 17-23. An infringement of First Amendment rights, however, cannot be justified by a State's alternative view that the infringement advances religious liberty. Our federal system prizes state experimentation, but not "state experimentation in the suppression of free speech," and the same goes for the free exercise of religion.
*2261 Boy Scouts of America v. Dale , 530 U.S. 640, 660, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000).
Furthermore, we do not see how the no-aid provision promotes religious freedom. As noted, this Court has repeatedly upheld government programs that spend taxpayer funds on equal aid to religious observers and organizations, particularly when the link between government and religion is attenuated by private choices. A school, concerned about government involvement with its religious activities, might reasonably decide for itself not to participate in a government program. But we doubt that the school's liberty is enhanced by eliminating any option to participate in the first place.
The Department's argument is especially unconvincing because the infringement of religious liberty here broadly affects both religious schools and adherents. Montana's no-aid provision imposes a categorical ban-"broadly and strictly" prohibiting "any type of aid" to religious schools. 393 Mont. at 462-463, 435 P.3d at 611. This prohibition is far more sweeping than the policy in Trinity Lutheran , which barred churches from one narrow program for playground resurfacing-causing "in all likelihood" only "a few extra scraped knees." 582 U.S., at ----, 137 S.Ct., at 2024-2025.
And the prohibition before us today burdens not only religious schools but also the families whose children attend or hope to attend them. Drawing on "enduring American tradition," we have long recognized the rights of parents to direct "the religious upbringing" of their children. Wisconsin v. Yoder , 406 U.S. 205, 213-214, 232, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). Many parents exercise that right by sending their children to religious schools, a choice protected by the Constitution. See Pierce v. Society of Sisters , 268 U.S. 510, 534-535, 45 S.Ct. 571, 69 L.Ed. 1070 (1925). But the no-aid provision penalizes that decision by cutting families off from otherwise available benefits if they choose a religious private school rather than a secular one, and for no other reason.
The Department also suggests that the no-aid provision advances Montana's interests in public education. According to the Department, the no-aid provision safeguards the public school system by ensuring that government support is not diverted to private schools. See Brief for Respondents 19, 25. But, under that framing, the no-aid provision is fatally underinclusive because its "proffered objectives are not pursued with respect to analogous nonreligious conduct." Lukumi , 508 U.S. at 546, 113 S.Ct. 2217. On the Department's view, an interest in public education is undermined by diverting government support to any private school, yet the no-aid provision bars aid only to religious ones. A law does not advance "an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited." Id. , at 547, 113 S.Ct. 2217 (internal quotation marks and alterations omitted). Montana's interest in public education cannot justify a no-aid provision that requires only religious private schools to "bear [its] weight." Ibid.
A State need not subsidize private education. But once a State decides to do so, it cannot disqualify some private schools solely because they are religious.
III
The Department argues that, at the end of the day, there is no free exercise violation here because the Montana Supreme Court ultimately eliminated the scholarship program altogether. According to the Department, now that there is no program, religious schools and adherents *2262 cannot complain that they are excluded from any generally available benefit.
Two dissenters agree. Justice GINSBURG reports that the State of Montana simply chose to "put all private school parents in the same boat" by invalidating the scholarship program, post , at 2281, and Justice SOTOMAYOR describes the decision below as resting on state law grounds having nothing to do with the federal Free Exercise Clause, see post , at 2292, 2294 - 2295.
The descriptions are not accurate. The Montana Legislature created the scholarship program; the Legislature never chose to end it, for policy or other reasons. The program was eliminated by a court, and not based on some innocuous principle of state law. Rather, the Montana Supreme Court invalidated the program pursuant to a state law provision that expressly discriminates on the basis of religious status. The Court applied that provision to hold that religious schools were barred from participating in the program. Then, seeing no other "mechanism" to make absolutely sure that religious schools received no aid, the court chose to invalidate the entire program. 393 Mont. at 466-468, 435 P.3d at 613-614.
The final step in this line of reasoning eliminated the program, to the detriment of religious and non-religious schools alike. But the Court's error of federal law occurred at the beginning. When the Court was called upon to apply a state law no-aid provision to exclude religious schools from the program, it was obligated by the Federal Constitution to reject the invitation. Had the Court recognized that this was, indeed, "one of those cases" in which application of the no-aid provision "would violate the Free Exercise Clause," id. , at 468, 435 P.3d at 614, the Court would not have proceeded to find a violation of that provision. And, in the absence of such a state law violation, the Court would have had no basis for terminating the program. Because the elimination of the program flowed directly from the Montana Supreme Court's failure to follow the dictates of federal law, it cannot be defended as a neutral policy decision, or as resting on adequate and independent state law grounds.[4]
The Supremacy Clause provides that "the Judges in every State shall be bound" by the Federal Constitution, "any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." Art. VI, cl. 2. "[T]his Clause creates a rule of decision" directing state courts that they "must not give effect to state laws that conflict with federal law[ ]." Armstrong v. Exceptional Child Center, Inc. , 575 U.S. 320, 324, 135 S.Ct. 1378, 191 L.Ed.2d 471 (2015). Given the conflict between the Free Exercise Clause and the application of the no-aid provision here, the Montana Supreme Court should have "disregard[ed]" the no-aid provision and decided this case "conformably to the [C]onstitution" of the United States. Marbury v. Madison , 1 Cranch 137, 178, 5 U.S. 137, 2 L.Ed. 60 (1803). That "supreme law of the land" condemns discrimination against religious schools and the families whose children attend them. Id. , at 180. They are "member[s] of the community too," and *2263 their exclusion from the scholarship program here is "odious to our Constitution" and "cannot stand." Trinity Lutheran , 582 U.S., at ----, ----, 137 S.Ct., at 2023, 2025.[5]
* * *
The judgment of the Montana Supreme Court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.
It is so ordered.
Justice THOMAS, with whom Justice GORSUCH joins, concurring.
The Court correctly concludes that Montana's no-aid provision expressly discriminates against religion in violation of the Free Exercise Clause. And it properly provides relief to Montana religious schools and the petitioners who wish to use Montana's scholarship program to send their children to such schools. I write separately to explain how this Court's interpretation of the Establishment Clause continues to hamper free exercise rights. Until we correct course on that interpretation, individuals will continue to face needless obstacles in their attempts to vindicate their religious freedom.
I
A
This case involves the Free Exercise Clause, not the Establishment Clause. But as in all cases involving a state actor, the modern understanding of the Establishment Clause is a "brooding omnipresence," Southern Pacific Co. v. Jensen , 244 U.S. 205, 222, 37 S.Ct. 524, 61 L.Ed. 1086 (1917) (Holmes, J., dissenting), ever ready to be used to justify the government's infringement on religious freedom. Under the modern, but erroneous, view of the Establishment Clause, the government must treat all religions equally and treat religion equally to nonreligion. As this Court stated in its first case applying the Establishment Clause to the States, the government cannot "pass laws which aid one religion, aid all religions, or prefer one religion over another." Everson v. Board of Ed. of Ewing , 330 U.S. 1, 15, 67 S.Ct. 504, 91 L.Ed. 711 (1947) ; see also post , at 2282 - 2283 (BREYER, J., dissenting). This "equality principle," the theory goes, prohibits the government from expressing any preference for religion-or even permitting any signs of religion in the governmental realm. Thus, when a plaintiff brings a free exercise claim, the government may defend its law, as Montana did here, on the ground that the law's restrictions are required to prevent it from "establishing" religion.
This understanding of the Establishment Clause is unmoored from the original meaning of the First Amendment. As I have explained in previous cases, at the founding, the Clause served only to "protec[t] States, and by extension their citizens, from the imposition of an established religion by the Federal Government." Zelman v. Simmons-Harris , 536 U.S. 639, 678, 122 S.Ct. 2460, 153 L.Ed.2d 604 (2002) (THOMAS, J., concurring) (emphasis added); see also, e.g. , Town of Greece v. Galloway , 572 U.S. 565, 604-607, 134 S.Ct. 1811, 188 L.Ed.2d 835 (2014) (THOMAS, J., concurring in part and concurring in judgment); Elk Grove Unified School Dist. v. Newdow , 542 U.S. 1, 49-50, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004) (THOMAS, J., concurring in judgment). Under this view, the Clause resists incorporation against the States. See Town of Greece , 572 U.S. at 604, 134 S.Ct. 1811 (opinion of THOMAS, J.).
*2264 There is mixed historical evidence concerning whether the Establishment Clause was understood as an individual right at the time of the Fourteenth Amendment's ratification. Id. , at 607-608, 134 S.Ct. 1811. Even assuming that the Clause creates a right and that such a right could be incorporated, however, it would only protect against an "establishment" of religion as understood at the founding, i.e. , " 'coercion of religious orthodoxy and of financial support by force of law and threat of penalty.' " Id. , at 608, 134 S.Ct. 1811 (quoting Lee v. Weisman , 505 U.S. 577, 640, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) (Scalia, J., dissenting); emphasis deleted); American Legion v. American Humanist Assn. , 588 U.S. ----, ----, 139 S.Ct. 2067, 2095-2096, 204 L.Ed.2d 452 (2019) (THOMAS, J., concurring in judgment); see also McConnell, Establishment and Disestablishment at the Founding, Part I: Establishment of Religion, 44 Wm. & Mary L. Rev. 2105, 2131-2181 (2003) ; McConnell, Coercion: The Lost Element of Establishment, 27 Wm. & Mary L. Rev. 933, 936-939 (1986).[1]
Thus, the modern view, which presumes that States must remain both completely separate from and virtually silent on matters of religion to comply with the Establishment Clause, is fundamentally incorrect. Properly understood, the Establishment Clause does not prohibit States from favoring religion. They can legislate as they wish, subject only to the limitations in the State and Federal Constitutions. See Muñoz, The Original Meaning of the Establishment Clause and the Impossibility of Its Incorporation, 8 U. Pa. J. Const. L. 585, 632 (2006).
B
I have previously made these points in Establishment Clause cases to show that the Clause likely has no application to the States or, if it is capable of incorporation, that the Court employs a far broader test than the Clause's original meaning. See, e.g. , American Legion , 588 U.S., at ----, 139 S.Ct., at 2094-2095 (opinion concurring in judgment); Town of Greece , 572 U.S. at 604, 134 S.Ct. 1811 (opinion concurring in part and concurring in judgment). But the Court's wayward approach to the Establishment Clause also impacts its free exercise jurisprudence. Specifically, its overly expansive understanding of the former Clause has led to a correspondingly cramped interpretation of the latter.
Under this Court's current approach, state and local governments may rely on the Establishment Clause to justify policies that others wish to challenge as violations of the Free Exercise Clause. Once the government demonstrates that its policy is required for compliance with the Constitution, any claim that the policy infringes on free exercise cannot survive. A few examples suffice to illustrate this practice.
Of most relevance to this case is Locke v. Davey , 540 U.S. 712, 124 S.Ct. 1307, 158 L.Ed.2d 1 (2004), which Montana principally relies on to justify its discriminatory law. In Locke , the Court held that prohibiting a student from using a generally available state scholarship to pursue a degree in devotional theology did not violate the student's free exercise rights. This was so, the Court said, in part because it furthered the State's "antiestablishment interests" in avoiding the education of religious ministers. Id. , at 722, 124 S.Ct. 1307.
*2265 But no antiestablishment interests, properly understood, were at issue in Locke . The State neither coerced students to study devotional theology nor conscripted taxpayers into supporting any form of orthodoxy. Thus, as I have explained, Locke incorrectly interpreted the Establishment Clause and should not impact free exercise challenges. Trinity Lutheran Church of Columbia , Inc. v. Comer , 582 U.S. ----, ----, 137 S.Ct. 2012, 2025, 198 L.Ed.2d 551 (2017) (THOMAS, J., concurring). Yet, as Montana's proffered justification for its law shows, governments continue to rely on Locke 's improper understanding of "antiestablishment interests" to defend against free exercise challenges. See Brief for State of Colorado et al. as Amici Curiae 3, 10-12 (arguing that Locke justifies the 38 state constitutional provisions that are similar to Montana's); see also Trinity Lutheran Church of Columbia, Inc. v. Pauley , 788 F.3d 779, 785 (CA8 2015), rev'd and remanded, 582 U.S. ----, 137 S.Ct. 2012, 198 L.Ed.2d 551 (2017) ; Eulitt v. Maine , 386 F.3d 344, 354 (CA1 2004) ; post , at 2283 - 2285 (BREYER, J., dissenting); post , at 2296 - 2297 (SOTOMAYOR, J., dissenting).
The Court has also repeatedly stated that a government has a compelling interest in avoiding an Establishment Clause violation altogether, which "may justify" abridging other First Amendment freedoms. See Good News Club v. Milford Central School , 533 U.S. 98, 112, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001) ; Lamb's Chapel v. Center Moriches Union Free School Dist. , 508 U.S. 384, 394, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993) ; Widmar v. Vincent , 454 U.S. 263, 271, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981). Unsurprisingly, governmental employers have relied on these pronouncements to defeat challenges from employees who alleged violations of their First Amendment rights. See, e.g. , Berry v. Department of Social Servs. , 447 F.3d 642, 650-651 (CA9 2006) ; Knight v. Connecticut Dept. of Public Health , 275 F.3d 156, 166 (CA2 2001) ; Marchi v. Board of Cooperative Ed. Servs. of Albany , 173 F.3d 469, 475 (CA2 1999).
Finally, this Court's infamous test in Lemon v. Kurtzman , 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), has sometimes been understood to prohibit governmental practices that have the effect of endorsing religion. See Lynch v. Donnelly , 465 U.S. 668, 692, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring). This, too, presupposes that the Establishment Clause prohibits the government from favoring religion or taking steps to promote it. But as described supra , at 2263 - 2264, the Establishment Clause does nothing of the sort. The concern with avoiding endorsement has nevertheless been used to prohibit voluntary practices that potentially implicate free exercise rights, with courts and governments going so far as to make the "remarkable" suggestion "that even while off duty, a teacher or coach cannot engage in any outward manifestation of religious faith." Kennedy v. Bremerton School Dist. , 586 U.S. ----, ----, 139 S.Ct. 634, 637, 203 L.Ed.2d 137 (2019) (ALITO, J., concurring in denial of certiorari); see Santa Fe Independent School Dist. v. Doe , 530 U.S. 290, 308, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000) (voluntary decision to begin football games with a prayer violated the Establishment Clause); see also Kennedy v. Bremerton School Dist. , 869 F.3d 813, 831 (CA9 2017) (M. Smith, J., concurring) (coach's decision to lead voluntary prayer after football games); Walz v. Egg Harbor Twp. Bd. of Ed. , 342 F.3d 271, 280 (CA3 2003) (student's decision to distribute small gifts with religious messages to classmates).
II
The Court's current understanding of the Establishment Clause actually thwarts, *2266 rather than promotes, equal treatment of religion. Under a proper understanding of the Establishment Clause, robust and lively debate about the role of religion in government is permitted, even encouraged, at the state and local level. The Court's distorted view of the Establishment Clause, however, removes the entire subject of religion from the realm of permissible governmental activity, instead mandating strict separation.
This interpretation of the Establishment Clause operates as a type of content-based restriction on the government. The Court has interpreted the Free Speech Clause to prohibit content-based restrictions because they "value some forms of speech over others," City of Ladue v. Gilleo , 512 U.S. 43, 60, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994) (O'Connor, J., concurring), thus tending to "tilt public debate in a preferred direction," Sorrell v. IMS Health Inc. , 564 U.S. 552, 578-579, 131 S.Ct. 2653, 180 L.Ed.2d 544 (2011). The content-based restriction imposed by this Court's Establishment Clause jurisprudence operates no differently. It communicates a message that religion is dangerous and in need of policing, which in turn has the effect of tilting society in favor of devaluing religion.
Historical evidence suggests that many advocates for this separationist view were originally motivated by hostility toward certain disfavored religions. See P. Hamburger, Separation of Church and State 391-454 (2002). And this Court's adoption of a separationist interpretation has itself sometimes bordered on religious hostility. Justice Black, well known for his role in formulating the Court's modern Establishment Clause jurisprudence, once described Catholic petitioners as "powerful sectarian religious propagandists" "looking toward complete domination and supremacy" of their "preferences and prejudices." Board of Ed. of Central School Dist. No. 1 v. Allen , 392 U.S. 236, 251, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968) (dissenting opinion). Other Members of the Court have characterized religions as "divisive forces." Edwards v. Aguillard , 482 U.S. 578, 584, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) (internal quotation marks omitted); Board of Ed. of Westside Community Schools (Dist. 66) v. Mergens , 496 U.S. 226, 287, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) (Stevens, J., dissenting) (internal quotation marks omitted); Illinois ex rel. McCollum v. Board of Ed. of School Dist. No. 71, Champaign Cty. , 333 U.S. 203, 231, 68 S.Ct. 461, 92 L.Ed. 649 (1948) (Frankfurter, J., concurring). And the Court once described a statute permitting employees to request accommodations to avoid work on the Sabbath as "arm[ing]" religious employees with the "absolute and unqualified right" to pursue their religion "over all other ... interests." Estate of Thornton v. Caldor, Inc. , 472 U.S. 703, 709-711, 105 S.Ct. 2914, 86 L.Ed.2d 557 (1985). The siren song of religion is apparently so strong that we once held that public school teachers cannot provide assistance at parochial schools, lest they "subtly (or overtly) conform their instruction to the environment in which they teach." School Dist. of Grand Rapids v. Ball , 473 U.S. 373, 388, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985), overruled by Agostini v. Felton , 521 U.S. 203, 235, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997). In the Court's view, "[t]he 'atmosphere' of a Catholic school ha[d] such power to influence the unsuspecting mind that it may move even public school ... specialists to 'conform'-though their only contact with the school is to walk down its halls." McConnell, Religious Freedom at a Crossroads, 59 U. Chi. L. Rev. 115, 122 (1992).
Although such hostility may not be overtly expressed by the Court any longer, manifestations of this "trendy disdain for deep religious conviction" assuredly live *2267 on. Locke , 540 U.S. at 733, 124 S.Ct. 1307 (Scalia, J., dissenting). They are evident in the fact that, unlike other constitutional rights, the mere exposure to religion can render an " 'offended observer' " sufficiently injured to bring suit against the government, American Legion , 588 U.S., at ----, 139 S.Ct., at 2098 (GORSUCH, J., concurring in judgment), even if he has not been coerced in any way to participate in a religious practice, Lee , 505 U.S. at 584, 112 S.Ct. 2649 ; Engel v. Vitale , 370 U.S. 421, 430, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962).[2] We also see them in the special privilege of taxpayer standing in Establishment Clause challenges, even though such suits directly contravene Article III's restrictions on standing. See Hein v. Freedom From Religion Foundation, Inc. , 551 U.S. 587, 618, 127 S.Ct. 2553, 168 L.Ed.2d 424 (2007) (Scalia, J., concurring in judgment); see also Bowen v. Kendrick , 487 U.S. 589, 618-620, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988) ; Flast v. Cohen , 392 U.S. 83, 102-104, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). And they persist in the repeated denigration of those who continue to adhere to traditional moral standards, as well as laws even remotely influenced by such standards, as outmoded at best and bigoted at worst. See Masterpiece Cakeshop , Ltd. v. Colorado Civil Rights Comm'n , 584 U.S. ----, ----, 138 S.Ct. 1719, 1747-1748, 201 L.Ed.2d 35 (2018) (THOMAS, J., concurring in part and concurring in judgment); Obergefell v. Hodges , 576 U.S. 644, 712, 135 S.Ct. 2584, 192 L.Ed.2d 609 (2015) (ROBERTS, C.J., dissenting). So long as this hostility remains, fostered by our distorted understanding of the Establishment Clause, free exercise rights will continue to suffer.
* * *
As I have recently explained, this Court has an unfortunate tendency to prefer certain constitutional rights over others. See United States v. Sineneng-Smith , --- U.S. ----, ----, 140 S.Ct. 1575, 1586, --- L.Ed.2d ---- (2020) (THOMAS, J., concurring). The Free Exercise Clause, although enshrined explicitly in the Constitution, rests on the lowest rung of the Court's ladder of rights, and precariously so at that. Returning the Establishment Clause to its proper scope will not completely rectify the Court's disparate treatment of constitutional rights, but it will go a long way toward allowing free exercise of religion to flourish as the Framers intended. I look forward to the day when the Court takes up this task in earnest.

The Legislature provided the same tax credit to taxpayers who donate to public schools for the purpose of supporting innovative educational programs or curing technology deficiencies at such schools. See Mont. Code Ann. § 15-30-3110 (2019).

Justice SOTOMAYOR argues that the Montana Supreme Court "expressly declined to reach any federal issue." Post , at 2295 (dissenting opinion). Not so. As noted, supra , at 2253, the Montana Supreme Court recognized that certain applications of the no-aid provision could "violate the Free Exercise Clause." 393 Mont. 446, 468, 435 P.3d 603, 614 (2018). But the Court expressly concluded that "this is not one of those cases." Ibid.

Justice BREYER sees "no meaningful difference" between concerns animating bans on support for clergy and bans on support for religious schools. Post , at 2286. But evidently early American governments did. See supra, at 2258. Justice BREYER contests particular examples but acknowledges that some bans on clergy support did not bar certain "sponsorship" of religious schools. Post , at 2286. And, central to the issue here, he certainly does not identify a consistent early tradition, of the sort invoked in Locke , against support for religious schools. Virginia's opposition to establishing university theology professorships and chartering theological seminaries, see ibid. , do not fit the bill. Buckley, After Disestablishment: Thomas Jefferson's Wall of Separation in Antebellum Virginia, 61 J. So. Hist. 445, 452-453 (1995). Justice BREYER also invokes Madison's objections to the Virginia Assessment Bill, post , at 2285 - 2286, but Madison objected in part because the Bill provided special support to certain churches and clergy, thereby "violat[ing] equality by subjecting some to peculiar burdens." Memorial and Remonstrance Against Religious Assessments, Art. 4, reprinted in Everson , 330 U.S. at 66, 67 S.Ct. 504 (appendix to dissenting opinion of Rutledge, J.); see V. Muñoz, God and the Founders: Madison, Washington, and Jefferson 21-22, 27 (2009). It is far from clear that the same objections extend to programs that provide equal support to all private primary and secondary schools. If anything, excluding religious schools from such programs would appear to impose the "peculiar burdens" feared by Madison.

Justice SOTOMAYOR worries that, in light of our decision, the Montana Supreme Court must "order the State to recreate" a scholarship program that "no longer exists." Post , at 2295 (dissenting opinion). But it was the Montana Supreme Court that eliminated the program, in the decision below, which remains under review. Our reversal of that decision simply restores the status quo established by the Montana Legislature before the Court's error of federal law. We do not consider any alterations the Legislature may choose to make in the future.

In light of this holding, we do not address petitioners' claims that the no-aid provision, as applied, violates the Equal Protection Clause or the Establishment Clause.