

**KEN PAXTON**

ATTORNEY GENERAL OF TEXAS

March 20, 2023

The Honorable Brandon Creighton
Chair, Senate Committee on Education
Texas State Senate
Post Office Box 12068
Austin, Texas 78711-2068

      **Opinion No. KP-0439**

      Re: Constitutionality of legislation creating a Texas Education Savings Account program for Texas children (RQ-0502-KP)

Dear Senator Creighton:

      You ask about the constitutionality of Texas's "Blaine Amendments" and of a Texas Education Savings Account ("ESA") program.[1] You ask first whether "Texas's Blaine Amendments violate the Free Exercise Clause of the First Amendment to the U.S. Constitution[.]" Request Letter at 2. Second, you ask whether "an ESA program that makes available education assistance payments to program participants, including for sectarian schools and tutors, violate[s] the Establishment Clause of the First Amendment to the U.S. Constitution[.]" *Id.* Lastly, you ask whether "an ESA program that makes available education assistance payments to program participants in order to achieve a general diffusion of knowledge violate[s] Article VII, [section] 1 or Article VII, [section] 5 of the Texas Constitution[.]"[2] *Id.*

      **Texas's Blaine Amendments violate the First Amendment and are unenforceable.**

      The original Blaine Amendment was an amendment to the United States Constitution proposed by Congressman James G. Blaine in the 1870s that would have amended the Constitution to bar any federal aid to "sectarian" institutions. *See Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246, 2268 (2020) (Alito, J., concurring); *Mitchell v. Helms*, 530 U.S. 793, 828 (2000)

---

[1]*See* Letter from Honorable Brandon Creighton, Chair, Senate Comm. on Higher Educ., Tex. State Senate, to Honorable Ken Paxton, Tex. Att'y Gen. at 1 (March 10, 2023), https://texasattorneygeneral.gov/sites/default/files /requestfiles/request/2022/RQ0502KP.pdf ("Request Letter").

[2]As an initial matter, we note you do not describe a particular ESA program. *See generally* Request Letter at 1–3. Instead, you focus on the participation in the program by sectarian schools. *See id.* Accordingly, we do not opine on a particular ESA program but limit our opinion to the constitutionality of a program that generally allows participation by sectarian schools. There are several bills currently pending in the Eighty-eighth Legislature that provide for educational savings accounts. *See, e.g.*, Tex. S.B. 8, 88th Leg., R.S. (2023); Tex. H.B. 557, 88th Leg., R.S. (2023).

(disavowing "shameful pedigree" of hostility to aid to "sectarian" schools).[3] Although the proposed amendment was never adopted, several states, including Texas, later adopted similar amendments to their state constitutions or enacted comparable state laws.[4] These provisions are colloquially referred to as "Blaine Amendments."

Texas's Blaine Amendments are found in article I, section 7, and article VII, subsection 5(c) of the Texas Constitution. Article I, section 7 of the Texas Constitution provides that

> [n]o money shall be appropriated, or drawn from the Treasury for the benefit of any sect, or religious society, theological or religious seminary; nor shall property belonging to the State be appropriated for any such purposes.

TEX. CONST. art. I, § 7. Separately, article VII, subsection 5(c), relating to the permanent and available school funds, provides that "[t]he permanent school fund and the available school fund may not be appropriated to or used for the support of any sectarian school." *Id.* art. VII, § 5(c).

The First Amendment, which applies to the states through the Fourteenth Amendment and therefore trumps an offending provision of the Texas Constitution,[5] provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. CONST. amend. I. The United States Supreme Court has "repeatedly held that a State violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits." *Carson v. Makin*, 142 S. Ct. 1987, 1996 (2022) (collecting cases). And since 2017, the Court has on three occasions struck down state policies that discriminated against religious organizations on terms materially indistinguishable from Texas's Blaine Amendments.[6] *See Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019–20 (2017); *Espinoza*, 140 S. Ct. at 2254; *Carson*, 142 S. Ct. at 1997. A plain reading of the First Amendment and applicable Supreme Court precedent compels the conclusion that Texas's Blaine Amendments violate the Free Exercise Clause of the First Amendment to the United States Constitution. As such, Texas's Blaine Amendments are unenforceable and may not be relied on to exclude religious schools from receiving funds through the ESA program that you describe. It follows that any state action, regardless of the validity of Texas's Blaine Amendments, that excludes religious schools from otherwise available public benefits based solely on religious affiliation violates the Free Exercise Clause.

---

[3]"Consideration of the amendment arose at a time of pervasive hostility to the Catholic Church and to Catholics in general, and it was an open secret that 'sectarian' was code for 'Catholic.'" *Mitchell*, 530 U.S. at 828.

[4]*See Espinoza*, 140 S. Ct. at 2269 (Alito, J., concurring) (stating that "[t]hirty-eight States still have these 'little Blaine Amendments' today").

[5]The First Amendment is binding on the states through the Fourteenth Amendment's due process clause, rendering "the legislatures of the states as incompetent as Congress" to enact laws that infringe on the free exercise of religion. *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).

[6]Although the challenged provisions in these cases do not purport to prohibit sectarian schools from receiving funding, the United States Supreme Court has nonetheless recognized that the Free Exercise Clause protects against "indirect coercion or penalties on the free exercise of religion, not just outright prohibitions[.]" *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450 (1988).

In 2017, the Court considered a Missouri program that offered grants to qualifying nonprofit organizations to install playground surfaces made from recycled rubber tires. *Trinity Lutheran*, 137 S. Ct. at 2017. The Missouri Department of Natural Resources ("Department") denied funding to Trinity Lutheran Church Child Learning Center solely because it was a church-operated school pursuant to a policy of denying grants to religious organizations. *See id.* at 2018. The Department argued its policy was compelled by a state constitutional provision providing

> [t]hat no money shall ever be taken from the public treasury, directly or indirectly, in aid of any church, sect or denomination of religion, or in aid of any priest, preacher, minister or teacher thereof[.]

*Id.* at 2017 (quoting MO. CONST. art. I, § VII). The Court observed that "[t]he Department's policy expressly discriminates against otherwise eligible recipients by disqualifying them from a public benefit solely because of their religious character." *Id.* at 2021. As such, the policy "imposes a penalty on the free exercise of religion that must be subjected to the 'most rigorous' scrutiny." *Id.* at 2024. Under strict-scrutiny review, government action "must advance interests of the highest order and must be narrowly tailored in pursuit of those interests." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993) (quotation marks omitted). In conducting its review, the Court rejected the Department's stated "policy preference for skating as far as possible from religious establishment concerns," concluding that "the state interest asserted here—in achieving greater separation of church and State than is already ensured under the Establishment Clause of the Federal Constitution—is limited by the Free Exercise Clause." *Trinity Lutheran*, 137 S. Ct. at 2024 (quoting *Widmar v. Vincent*, 454 U.S 263, 276 (1981)). Ultimately, the Court concluded that "the exclusion of Trinity Lutheran from a public benefit for which it is otherwise qualified, solely because it is a church, is odious to our Constitution . . . and cannot stand." *Id.* at 2025.

Three years later, the Court reached the same conclusion when it considered a Montana policy that excluded religious schools from a program that provided tax credits to donors who provided scholarships for private schools. *See Espinoza*, 140 S. Ct. at 2254. The Montana Legislature directed that the program be administered in accordance with a state constitutional provision providing that

> [t]he legislature . . . shall not make any direct or indirect appropriation or payment from any public fund or monies, or any grant of lands or other property for any sectarian purpose or to aid any church, school, academy, seminary, college, university, or other literary or scientific institution, controlled in whole or in part by any church, sect, or denomination.

*Id.* at 2252 (quoting MONT. CONST. art. X, § 6(1)). The Court observed that "[t]he Montana Constitution discriminate[d] based on religious status just like the Missouri policy in *Trinity Lutheran*," and applied strict-scrutiny review because the program "bar[red] religious schools from public benefits solely because of the religious character of the schools." *Id.* at 2255–56. Montana asserted three state interests that, in its opinion, survived strict-scrutiny review: (1) a greater separation of church and state than is guaranteed by the First Amendment; (2) promotion of

religious freedom "by ensuring that . . . taxes are not directed to religious organizations and . . . keeping the government out of [religious organizations'] operations"; and (3) advancement of public education "by ensuring that government support is not diverted to private schools." *Id.* at 2260–61. The Court rejected each argument, noting that a state's interest in achieving a greater separation of church and state than is guaranteed by the First Amendment "cannot qualify as compelling in the face of the infringement of free exercise [of religion]." *Id.* at 2260 (quotation mark omitted). Similarly, it rejected the argument that the no-aid provision promoted religious freedom because an infringement of First Amendment rights "cannot be justified by a State's alternative view that the infringement advances religious liberty." *Id.* Finally, it concluded that any argument relying on the state's interest in public education was undermined by the program's inclusion of secular private schools. *See id.* at 2261.

Finally, just last year the Court considered a Maine program that supplied tuition assistance for parents who live in school districts that do not provide secondary schools. *See Carson*, 142 S. Ct. at 1993–94. Under the program, parents could select either a public or "nonsectarian" private secondary school for their child to attend and the school district transmitted payments to that school. *See id.* at 1994. The Court again observed that private, religious schools were disqualified "solely because of their religious character." *Id.* at 1997 (quoting *Trinity Lutheran*, 137 S. Ct. at 2021). Further, "[b]y condition[ing] the availability of benefits in that manner, Maine's tuition assistance program—like the program in *Trinity Lutheran*—effectively penalizes the free exercise of religion." *Id.* (quotation marks omitted). The Court again subjected the challenged provision to strict-scrutiny review and—as in *Trinity Lutheran* and *Espinoza*—rejected Maine's stated interest in avoiding an Establishment Clause violation. *See id.* at 1997–98. The Court ultimately held that a "State need not subsidize private education. But once a State decides to do so, it cannot disqualify some private schools solely because they are religious." *Id.* at 2000 (quoting *Espinoza*, 140 S. Ct. at 2261).

The Court's analysis in *Trinity Lutheran*, *Espinoza*, and *Carson* compels the conclusion that Texas's Blaine Amendments found in article I, section 7, and article VII, subsection 5(c), and any laws, actions, or policies implementing them, violate the Free Exercise Clause to the First Amendment of the United States Constitution and are unenforceable.[7] There are no material differences in the provisions considered by the Court in these cases and Texas's Blaine Amendments. As the Court noted in *Carson*, "[w]hile the wording of the Montana and Maine provisions is different, their effect is the same: to disqualify some private schools from funding solely because they are religious." *Id.* at 1997 (quotation marks omitted). There can be no mistake that Texas's Blaine Amendments have the same effect as the provisions at issue in these cases— to "expressly discriminate[] against otherwise eligible recipients by disqualifying them from a public benefit solely because of their religious character." *Trinity Lutheran*, 137 S. Ct. at 2021. Moreover, there is no governmental interest sufficiently compelling under these Supreme Court cases to overcome this infringement on religious rights. Accordingly, any court that considers a constitutional challenge to Texas's Blaine Amendments "must not give effect to state laws that conflict with federal law[]" and should "disregard[]" Texas's Blaine Amendments and decide any

---

[7]To the extent they are inconsistent with this conclusion, we overrule the following attorney general opinions that pre-date the Supreme Court decisions relied upon herein: O-2832, O-5037, O-7128, and M-1036. *See* Tex. Att'y Gen. Op. Nos. O-2832 (1940), O-5037 (1943), O-7128 (1946), M-1036 (1972).

challenge "conformably to the [C]onstitution of the United States." *Espinoza*, 140 S. Ct. at 2262 (quoting *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015) and *Marbury v. Madison*, 5 U.S. 137 (1803)). In conclusion, Texas's Blaine Amendments violate the First Amendment to the United States Constitution and are unenforceable, as is any state action that presumes to exclude religious schools from otherwise available public benefits based solely on religious affiliation.

### The Establishment Clause does not prohibit a neutral educational assistance program just because a religious institution may benefit.

You next ask whether "an ESA program that makes available education assistance payments to program participants, including for sectarian schools and tutors, violate[s] the Establishment Clause of the First Amendment to the U.S. Constitution[.]" Request Letter at 2. The Establishment Clause—the other religion clause of the First Amendment—dictates that "Congress shall make no law respecting an establishment of religion[.]" U.S. CONST. amend. I.

The United States Supreme Court acknowledges the tension between the Establishment and the Free Exercise Clauses but notes that "there is room for play in the joints." *Locke v. Davey*, 540 U.S. 712, 718 (2004) (quoting *Walz v. Tax Comm'n of New York*, 397 U.S. 664, 669 (1970)). That play in the joints means that "there are some state actions permitted by the Establishment Clause but not required by the Free Exercise Clause"[8] allowing for the Court's repeated holdings that the Establishment Clause is not offended when religious observers and organizations benefit from neutral government programs. *Id.* at 719; *see also Espinoza*, 140 S. Ct. at 2254; *Trinity Lutheran*, 137 S. Ct. at 2019–20; *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 839 (1995); *Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. 1, 8 (1993); *Bowen v. Kendrick*, 487 U.S. 589, 609 (1988) ("[T]his court has never held that religious institutions are disabled by the First Amendment from participating in publicly sponsored social welfare programs."). Indeed, if that were the case then "a church could not be protected by the police and fire departments, or have its public sidewalk kept in repair." *Zobrest*, 509 U.S. at 8 (quoting *Widmar*, 454 U.S. at 274–75).

With respect to the specific context of education assistance payments, the United States Supreme Court has answered your question by upholding a voucher program against an Establishment Clause challenge. *See generally Zelman v. Simmons-Harris*, 536 U.S. 639 (2002). In *Zelman*, the Court examined a state benefit program designed to help the children of Cleveland, Ohio's failing public schools by providing tuition and tutorial aid to students to attend a public or private school, including private schools with a religious affiliation. *See id.* at 644–48. The Court stated that a voucher program does not offend the Establishment Clause if the program "is neutral with respect to religion, and provides assistance directly to a broad class of citizens who, in turn, direct government aid to religious schools wholly as a result of their own genuine and independent private choice." *Id.* at 652. The Court evaluated Ohio's benefit program under five factors and found: it was "part of a general and multifaceted undertaking by the State of Ohio to provide

---

[8]*See Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2426 (2022) (acknowledging tension between what is compelled by the Free Exercise Clause and what is permitted by the Establishment Clause but noting that the Clauses, along with the Free Speech Clause, "appear in the same sentence of the same Amendment" and stating that a natural reading of that sentence suggests "the Clauses have 'complementary' purposes, not warring ones where one Clause is always sure to prevail over the others").

educational opportunities to the children of a failed school district"; the tuition aid went to parents, not to the schools; it covered a broad class of beneficiaries by covering all school-age students in the program area; it was neutral with respect to religion as parents were not required to enroll their student in a religiously-affiliated school; and it provided nonreligious options by virtue of the fact that public schools in adjoining districts and nonreligious private schools would accept the vouchers. *Id.* at 653, 662–63.

The United States Supreme Court has at least twice reaffirmed *Zelman*. Most recently in the *Carson v. Makin* decision, in addition to its discussion of the Maine program under the Free Exercise Clause, the Court noted that "a neutral benefit program in which public funds flow to religious organizations through the independent choices of private benefit recipients does not offend the Establishment Clause." 142 S. Ct. at 1997. Similarly, in *Espinoza v. Montana Dep't of Revenue*, the Court noted that, with respect to the Establishment Clause, a challenge to Montana's scholarship program would be unavailing "because the government support makes its way to religious schools only as a result of Montanans independently choosing to spend their scholarships at such schools." 140 S. Ct. at 2254.

Accordingly, an ESA program in Texas that satisfies the five-factor inquiry set forth in *Zelman* does not violate the Establishment Clause.

**The Texas Constitution does not prohibit the Legislature from establishing an ESA program so long as it is not funded by the permanent school fund or available school fund.**

You lastly ask whether "an ESA program that makes available education assistance payments to program participants in order to achieve a general diffusion of knowledge violate[s]" article VII, sections 1 or 5 of the Texas Constitution. Request Letter at 2.

Article VII, section 1 provides that "[a] general diffusion of knowledge being essential to the preservation of the liberties and rights of the people, it shall be the duty of the Legislature of the State to establish and make suitable provision for the support and maintenance of an efficient system of public free schools."[9] TEX. CONST. art. VII, § 1. This section speaks only to the Legislature's duty to establish and "make suitable provision for the support and maintenance of an efficient system of *public* free schools." *Id.* (emphasis added). It does not preclude the Legislature from enacting additional educational initiatives independent of a public school system. *Id.* The Legislature may satisfy its duty under section 1 to establish and make suitable provision for the support and maintenance of an efficient system of public free schools while also providing for an ESA program; section 1 does not render the two mutually exclusive. *See Duncan v. Gabler*, 215 S.W.2d 155, 158 (Tex. 1948) ("[E]xcept in the particulars wherein it is restrained by the Constitution of the United States, the legislative department may exercise all legislative power which is not forbidden expressly or by implication by the provisions of the Constitution of the state of Texas." (quoting *Brown v. City of Galveston*, 75 S.W. 488, 492 (Tex. 1903))).

---

[9]Currently pending resolutions would amend section 1. *See* Tex. H.J.R. 76, 88th Leg., R.S. (2023); Tex. H.J.R. 182, 88th Leg., R.S. (2023).

Moreover, to the extent section 1 is implicated at all by an ESA program, the Texas Supreme Court has granted the Legislature wide deference in fulfilling the constitutional duty imposed by this section. The Court has acknowledged its "limited constitutional role" in relation to section 1 and has stated that its "settled precedent . . . frowns upon judicial second-guessing of policy choices[.]" *Morath v. Tex. Taxpayer & Student Fairness Coal.*, 490 S.W.3d 826, 845–46 (Tex. 2016) (providing that under section 1, the Legislature is required to ensure that the public school system must be adequate, suitable, and efficient). Ultimately, courts find a violation of section 1 only if the Legislature has acted arbitrarily or unreasonably. *See id.* at 846 ("At bottom, the 'crux' of this standard is 'reasonableness,' and the lens through which we view these challenges maintains a default position of deference to the Legislature—that political branch responsible for establishing a constitutionally compliant system."); *Neeley v. W. Orange-Cove Consol. Indep. Sch. Dist.*, 176 S.W.3d 746, 784–85 (Tex. 2005).

You also point to article VII, section 5, which provides in relevant part that

> [t]he available school fund shall be applied annually to the support of the public free schools. Except as provided by this section, the legislature may not enact a *law appropriating any part of the permanent school fund or available school fund to any other purpose. The permanent school fund and the available school fund may not be appropriated to or used for the support of any sectarian school.* The available school fund shall be distributed to the several counties according to their scholastic population and applied in the manner provided by law.

TEX. CONST. art. VII, § 5(c) (emphasis added). Subsection 5(c) preserves two sources of funding exclusively for public schools: the permanent school fund and the available school fund. Under subsection 5(c), an ESA program may not rely on either of these sources of funding. *Id.* (stating that "the legislature may not enact a law appropriating any part of the permanent school fund or available school fund to any other purpose"). But subsection 5(c) does not prohibit the use of *other* sources of funds for the purpose of establishing an ESA program.[10] Accordingly, the Legislature may enact additional educational initiatives, such as the ESA program you describe, that are derived from other sources of funding.[11] To the extent the ESA program is funded from other sources, subsection 5(c) does not apply and presents no impediment to enactment of such a program.

---

[10]As previously discussed, subsection 5(c)'s prohibition against an appropriation for the support of any "sectarian" school violates the Free Exercise Clause. *See supra* at 5–6. But even if this provision were enforceable, it applies only where "[t]he permanent school fund and the available school fund [are] appropriated to or used for the support of any sectarian school." TEX. CONST. art. VII, § 5(c).

[11]*See, e.g.*, General Appropriations Act, 2021–22 Biennium, 87th Leg., ch. 1053, art. III, riders 69, 72, 73, and 74, 2021 Tex. Gen. Laws 217, 241.

# S U M M A R Y

Texas's Blaine Amendments—article I, section 7, and article VII, subsection 5(c) of the Texas Constitution—violate the Free Exercise Clause of the First Amendment to the United States Constitution. Accordingly, any law, action, or policy implemented in accordance with their prohibitions would be unconstitutional.

An Education Savings Account program offering parents and students education assistance payments that can be directed to public and private schools, including "sectarian" schools, and that offers parents and students a genuine and independent choice to select a private religious school does not violate the Establishment Clause.

An ESA program does not violate article VII, section 1, or subsection 5(c) of the Texas Constitution to the extent the program is an additional educational initiative and is not funded from the permanent school fund or available school fund.

Very truly yours,

KEN PAXTON
Attorney General of Texas

BRENT E. WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

LESLEY FRENCH
Chief of Staff

D. FORREST BRUMBAUGH
Deputy Attorney General for Legal Counsel

AARON F. REITZ
Deputy Attorney General for Legal Strategy

AUSTIN KINGHORN
Chair, Opinion Committee