Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
01/02/2024 09:04 AM CST

Susan Ewing, appellee, v.
Joseph Evans, appellant.
___ N.W.2d ___

Filed December 26, 2023.    No. A-23-093.

1. **Modification of Decree: Child Custody: Visitation: Child Support: Appeal and Error.** Modification of a judgment or decree relating to child custody, visitation, or support is a matter entrusted to the discretion of the trial court, whose order is reviewed by an appellate court de novo on the record, and will be affirmed absent an abuse of discretion.

2. **Modification of Decree: Attorney Fees: Appeal and Error.** In an action for modification of a marital dissolution decree, the award of attorney fees is discretionary with the trial court, is reviewed de novo on the record, and will be affirmed in the absence of an abuse of discretion.

3. **Modification of Decree: Child Custody: Proof.** Ordinarily, custody and parenting time of a minor child will not be modified unless there has been a material change in circumstances showing that the best interests of the child require modification.

4. **Modification of Decree: Words and Phrases.** A material change in circumstances is the occurrence of something which, had it been known to the dissolution court at the time of the initial decree or prior modification, would have persuaded the court to decree differently.

5. **Modification of Decree: Child Custody: Proof.** Proof of a material change in circumstances is the threshold inquiry in a proceeding on a complaint to modify custody, because issues determined in the prior custody order are deemed preclusive in the absence of proof of new facts and circumstances.

6. **Modification of Decree: Child Custody.** When a change in custody is to be made, it should appear to the court that the material change in circumstances is more or less permanent or continuous and not merely transitory or temporary.

7. **Constitutional Law: Parental Rights.** A parent has a constitutional right under the Free Exercise Clause of the First Amendment to exercise religious practices and spiritual beliefs with their child.

8. **Constitutional Law.** Although the prohibition against infringement of religious belief is absolute, the immunity afforded religious practices by the First Amendment is not so rigid.

9. **Child Custody: Visitation.** The paramount consideration in all cases involving the custody or visitation of a child is the best interests of that child.

10. **Constitutional Law: Parental Rights.** When a court finds that particular religious practices pose an immediate and substantial threat to a child's temporal well-being, a court may fashion an order aimed at protecting the child from that threat. In doing so, a court must narrowly tailor its order, so as to result in the least possible intrusion upon the constitutionally protected interests of the parent.

11. **Child Support: Evidence.** Generally, earning capacity should be used to determine a child support obligation only when there is evidence that the parent can realize that capacity through reasonable efforts.

12. **Attorney Fees.** Attorney fees and expenses may be recovered only where provided for by statute or when a recognized and accepted uniform course of procedure has been to allow recovery of attorney fees.

13. ____. Customarily, attorney fees are awarded only to prevailing parties or assessed against those who file frivolous suits.

14. **Divorce: Attorney Fees.** A uniform course of procedure exists in Nebraska for the award of attorney fees in dissolution cases.

15. **Attorney Fees.** In awarding attorney fees, a court shall consider the nature of the case, the amount involved in the controversy, the services actually performed, the results obtained, the length of time required for preparation and presentation of the case, the novelty and difficulty of the questions raised, and the customary charges of the bar for similar services.

Appeal from the District Court for Lancaster County: LORI A. MARET, Judge. Affirmed.

Mona L. Burton, of Anderson, Creager & Wittstruck, P.C., L.L.O., for appellant.

Tara L. Gardner-Williams and Joel Bacon, of Keating, O'Gara, Nedved & Peter, P.C., L.L.O., for appellee.

RIEDMANN, BISHOP, and WELCH, Judges.

Riedmann, Judge.

## I. INTRODUCTION

Joseph Evans appeals the order of the Lancaster County District Court that overruled his complaint to modify a custody order and parenting plan. We conclude that Evans failed to show a material change in circumstances to warrant modification. Furthermore, we find the district court did not abuse its discretion in enjoining Evans from taking the child into sweat lodges, imputing an earning capacity beyond his Veterans Administration (VA) disability benefits, and awarding Susan Ewing attorney fees. Therefore, we affirm.

## II. BACKGROUND

Evans and Ewing are the biological parents of a son born in May 2013. The parties were never married, and their relationship ended in February 2014. On January 23, 2015, Evans was in a severe automobile accident in which he collided with a wall at 75 miles per hour. Among his many injuries, he suffered a broken back, a traumatic brain injury, and bleeding in his brain.

In March 2015, the district court issued a custody order (2015 Order) regarding the parties' son. The order was based on a joint stipulation filed by the parties in which Ewing received sole physical and legal custody of their son and Evans received parenting time set out under a parenting plan. In addition to determining custody, the district court ordered that Evans pay $557 per month in child support.

At the time of trial, Evans was married to Erin Evans (Erin). Evans has three children: a 16-year-old daughter; the son at issue, who turned 9 years old during trial; and a 3-year-old daughter. Erin is the mother of the 3-year-old daughter only. Evans has parenting time with his older daughter every other weekend, Friday to Sunday, and for a brief window on Wednesdays. Evans' weekend parenting time with her aligns with his parenting time for his son.

## 1. Evans Files for Modification

In March 2021, Evans filed a complaint to modify the 2015 Order. He asserted that there had been two material changes of circumstances since the district court's 2015 Order. First, Evans was "no longer an active member of the National Guard and no longer subject to long periods of deployment and/or travel." Second, "[the parties' son's] behaviors have become increasingly problematic and disruptive in both school and [Ewing's] home." He requested that the 2015 Order be modified to award both parties joint legal and physical custody. Additionally, he stated that if the son's custody were to be modified, he would request that child support and other financial obligations be modified accordingly.

In April 2021, Ewing filed an answer and "Counter-Complaint." In her countercomplaint, Ewing asserted four material changes that necessitated modifying the parenting plan. The four material changes she alleged were: (1) Evans' income increased, so there should be an increase in child support; (2) their son struggles in Evans' care when he takes the son to sweat lodges on the weekend; (3) their son struggles after the conclusion of Evans' parenting time, so all such parenting time should end no later than 7 p.m.; and (4) their son no longer trick-or-treats, so Halloween should be removed from the parenting plan.

Following her answer and countercomplaint, Ewing motioned to enjoin Evans from taking their son to sweat lodges. She also filed a motion for attorney fees. After a hearing, the district court granted both of Ewing's motions.

The parties stipulated that Evans could file an amended complaint out of time. Evans added a third material change in circumstances, which was that Ewing was preventing him from exercising his constitutional rights under the Free Exercise Clause of the First Amendment to the U.S. Constitution by barring him from taking their son into a sweat lodge. In response to the amended complaint, Ewing filed an amended answer and countercomplaint in which she

asserted three additional "material and substantial change[s] in circumstances" to her countercomplaint, which included the following: Evans did not provide health insurance for their son despite the 2015 Order; winter break should be divided evenly between the parties, with transitions on the day halfway through winter break; and Ewing wishes to obtain a U.S. passport for their son. The parties later stipulated to their son's passport application.

## 2. Modification Trial

The trial lasted 3 days over the course of roughly 6 months. Trial was held on March 24, June 2, and August 15, 2022.

### (a) Son's Behavior Issues

#### (i) Diagnosis, Medication, and Treatment

Ewing testified that their son has had behavior issues since he was 2 or 3 years old. He was previously diagnosed with Oppositional Defiant Disorder (ODD). For the past 4 years, he has regularly taken Clonidine to treat his ODD.

When their son was 4 years old, he began treatment with Dr. Levita Bui, and he had six appointments. During the treatment period, Bui met only Ewing. Bui never met Evans. Bui testified that she could not recall why therapy ended.

Bui cannot conduct psychological testing. She is a psychologist, and her practice focuses on children, adolescents, and adults, as well as children with behavior or conduct disorders. Although she never addressed the son's transitions between households, she testified that hypothetically, any child, especially one diagnosed with or being treated for ODD, can have additional difficulty in transitioning between houses.

After Bui, the son saw different therapists, but his longest and current relationship with a therapist is with Robin Townsend, who also testified at trial. The son meets with Townsend every week during the school year and every other week during the summer. Townsend testified that during sessions, they focus on the son's struggles at school and how

his conduct at school is affected by the differences between Evans' and Ewing's homes. Together, they try to focus on how he can "be okay in both homes."

Beginning in 2021, Townsend also began family therapy sessions with Evans, Ewing, and their son. The family therapy sessions lasted 8 months. Townsend testified that when the family therapy sessions were in person, she noticed more tension in the room. The son would often check with his parents before answering questions, and there was a lot of tension between Evans and Ewing when it came to differences in how they operated their homes. Townsend explained she ended family therapy because the child was not properly regulating his behavior and Evans and Ewing were not communicating well with each other. She hoped to restart family therapy when the child can better use his coping skills consistently in all environments.

Based on Townsend's observation and the behavior reports she received from the child's school, she said she believes his behavior has fluctuated and regressed at times. For instance, she related that in the 3 months leading up to trial in March 2022, the child has appeared at sessions sleepy and even fallen asleep during some sessions. In the 6 months prior to her testimony, the child has also had moments where he refused to engage and has even "disassembled" Townsend's office once.

Overall, Townsend believes the child has gotten better at regulating his behavior and expressing his feelings but does not believe that he has significantly improved. Townsend also concluded that there was a pattern of the child's having difficulty at school, as well as showing up to a Monday session dysregulated, after spending the weekend with Evans. She explained that the child has difficulty with all transitions, not just transitions between homes. Even in school, a transition such as having a substitute teacher or going on a field trip can encourage dysregulation of his behavior.

Ewing testified that her son has "done a complete 180" and that his grades have greatly improved. She attributes this improvement, in part, to keeping him on a strict home regimen, which Ewing constructed with Townsend. Ewing testified that whenever the child returns from his father's house, he does not want to get back into his routine, is usually more tired and disrespectful, and fails to follow instructions.

### (ii) Son's Schooling

Beginning in 2018, the child began attending daycare. During 2018, he was expelled from four daycares for behavior issues. At school, the child receives assistance through an individualized education plan (IEP), which includes spending time with a special education teacher and receiving writing assistance. There are two IEP meetings each year, all of which Ewing has attended, but Evans has attended only one.

Evans clarified he missed IEP meetings in the past because of his own educational or medical obligations. He testified he still communicated with his son's teachers. Ewing disagreed; she characterized Evans' communication with teachers as "[b]arely anything." She testified Evans' text message communications about their son are equally short. For instance, when Ewing texted Evans that the child "punched a teacher today very hard so he is in in[-]school suspension for the day," Evans responded, "Omg okay."

The child's third grade teacher testified about the child's behavior in her class. She also recounted that Ewing attended both parent-teacher conferences, but that Evans did not. She recalled that the child had been improving throughout the school year, and she saw a notable positive shift after Christmas break.

The child's special education teacher maintains a daily behavior log pursuant to his IEP that she shares with his third grade teacher. The third grade teacher could not surmise what caused the child's bad behavior and noted that it is sporadic. She summarized his classroom conduct, stating that on days

when he is struggling, he can "shut down" and will not comply, and that there are times when he gets "physical," but it is "mostly . . . his inability to comply and finish a task." She also reported that his grades have improved and that his most recent grades at the time of her testimony in March 2022 were very positive.

Ewing discussed "seclusion letters" that she would receive from the child's school. A seclusion letter is a letter the school sends home when a child has to be secluded or restrained at school. In 2019, the child received 14 seclusion letters; in 2020, the child received only 3 seclusion letters; and in 2021, the most recent complete school year, the child received only 2 seclusion letters. Furthermore, the child's IEP report from December 2021 showed he was following instructions 76 percent of the time, was asking and accepting when he felt overwhelmed, and was keeping up great work.

### (iii) Evans' Request for Joint Custody

Evans requested joint custody for multiple reasons. At trial, he testified that he believes children deserve to have equal access to their parents and that it is in his son's best interests to have equal access. He attributes his son's behavior issues to the custody arrangement. He also believes that he is in a different position now than when the 2015 Order was issued.

Prior to Evans' injury, he worked for the Army National Guard. His job included recruiting and retention duties that divided his job duties across the State of Nebraska. His job required him to travel within the state, which could mean overnight trips on a weekly basis. He testified that given those prior work duties and his impression that he would eventually return to full service after his injury, he had not previously believed he was able to have joint custody of his son. Since his discharge from the military, Evans spends more time at home, which is partly his reasoning for now pursuing joint custody.

The last time Evans was deployed across the state was before his accident. The only military travel he did after his accident was two trips to Kansas for medical evaluations. Each trip to Kansas took 1 day. Evans clarified that the difference between his active duty after his accident and now is that he is "no longer subject to travel without any ability to cease travel due to my duties to — in the military being different to my responsibilities as a civilian."

Evans expounded on why he feels the current custody arrangement is not working. He stated the entire system around his son does not work for the child. He testified that he disagrees with the child's treatment and education plans. Specifically, he does not agree with prescribing Clonidine for the child. He explained that at trial he objected "because the side effects of Clonidine are related to the actual effects of ODD. . . . There's a lot of things going on there so I don't — I'm not against him taking medication for it, but I'm not sure if he's properly diagnosed." And he is not satisfied with Townsend's therapy and does not think she is "therapeutically the right fit." He also believes that the IEP is not working for his son and that the teachers are not following the IEP.

Evans would like his son to be tested again to see if he truly has ODD, then, with the results, to find a therapist that would be a better fit. He would like a therapist that is less "family systems centered" and would provide "a narrative therapy approach where [the child] tells the story in the way that he wants to tell it and from his own words. We take that story, we change his cognitive map by correcting thinking errors, and we move forward from there."

Evans has forfeited his weekend parenting time with his son in the past. He testified he forfeits such weekends with his son when he goes out of town to see his relatives at a Native American reservation, which occurs twice a year, or to participate in ceremonies out of state. He has exercised his parenting time for fall breaks only once. Evans was also unsure if he forfeited the previous Father's Day parenting time.

### (b) Sweat Lodge Use

Evans explained that the first 4 years of his life, his grandmother raised him "in the native way." But Evans' mother wanted to raise him herself, so they moved from South Dakota. Evans did not reengage with his Native American heritage until after the 2015 accident. He is not an enrolled member of any tribe, but participates in the Lakota Nation ceremonies, which include sweat lodges, sun dances, and other ceremonies, in South Dakota. He explained that he began reengaging in the ceremonies to heal himself in ways in which traditional medicine "wasn't working" and that he needed to clear that "negative spiritual energy in — in that [sweat] lodge."

Evans takes all of his children to the sweat lodge, including his 3-year-old daughter. A sweat lodge consists of a hole, which holds stones that have been warmed by fire, inside layers of tarps and blankets. Evans' best estimate of the temperature inside the sweat lodge is 100 degrees Fahrenheit at most, but he has previously measured a sweat lodge at 101.2 degrees. The amount of time inside the sweat lodge with the door closed is usually 45 minutes, although the amount of time at the sweat lodge is usually 1½ hours. Evans acknowledged that too much heat could be harmful but explained that his prior inability to remain in a sweat lodge "to finish" is related more to his inexperience on how to control his breathing and panic. He described his need to leave the sweat lodge and lie on the ground was "not only just to get the cold air but also to rest my back. Cause if you have fear, you tense up. You tense up you have a bad back."

Evans testified he lives an "Indigenous life." Evans treats the "Indigenous life" as a family affair, so he wants his son to be involved with his activities. Evans defines an "Indigenous life" as "spirituality," a way of life more than a religion. Evans fears that by not allowing his son in the sweat lodge, its participants will not be able to include him in prayers. Additionally, the child will not be able to hear stories of his

ancestors, because the elders with such wisdom tell those stories only while in the sweat lodge.

Susan Roaneagle, who is a member of the Oglala Lakota Nation, explained that a person does not need to be a tribal member to participate in a sweat lodge ceremony and that it was common for people of all religions to participate. There is one door in the sweat lodge, and participants are free to leave during the ceremony. She described sweat lodge ceremonies as a supplement to religion.

Erin, Evans' older daughter, and Roaneagle testified about observing the child in the sweat lodge and not noticing him to be in any kind of distress. Evans' older daughter testified when she was in the sweat lodge with the parties' son, he appeared to be enjoying himself, insofar as he would either sing songs or sleep. Roaneagle recalled that the child appeared to enjoy himself in the sweat lodge and would pray, smile, and sing. She also recalled that after the order barring the child from sweat lodges, he would sit outside with the other children and adults.

Evans testified he took his son to sweat lodges in hopes it would help with his conduct disorder. He believes the sweat lodge teaches self-control. He explained, "Plus if you imagine a hot and dark place and you learn how to control yourself and pray, you'll then learn a lot more body self[-]control." He hoped his son would grow from the experience of overcoming the heat and darkness and learn to listen and be patient and still. He believes his son needs spiritual help.

Ewing countered Evans' testimony by discussing her concerns with her son's health in a sweat lodge. She requested the court maintain its bar on the child's participation in sweat lodges. She believes it is unsafe for him. He takes Clonidine for his ODD, which affects his blood pressure. Neither Evans nor Ewing has checked with the child's doctor to ensure the sweat lodge would not have a negative interaction with the Clonidine.

### (c) Evans' Work Status

Evans is currently not employed. He is receiving VA disability benefits because of the motor vehicle accident that occurred in 2015. In May 2020, Evans was honorably discharged from the military. As of December 2021, Evans received an increase in his disability benefits. Both Evans and Ewing argued that Evans' ability to work, or lack thereof, required differing modifications to the child support he pays.

### (i) Evidence of Disability

Evans still experiences severe pain from the 2015 accident. He said that since the original injury, he has broken his back twice from "over doing it." He wears a back brace anytime he travels far or if he begins to experience a lot of pain. There are other times he relies on a cane. Evans explained that he worked at a restaurant after his accident in 2015 or 2016, but that the job was too physical for him and was too difficult on his back. Evans applied for disability but was told there were 15,000 jobs available for him.

Evans testified in March 2022 that he attended physical therapy on and off over the course of 2½ years. He also testified he believed he had 6 months remaining of physical therapy. However, when trial resumed in June, Evans admitted he had not been attending physical therapy since February and was planning on resuming physical therapy once he finished his master's degree.

In March 2022, Evans testified that he received an 80-percent disability rating from the VA. By August, Evans' VA benefits increased because his disability rating increased to 90 percent. This increase was part of the reason Ewing requested Evans' child support be recalculated, because Evans actually received the increase in 2021 but did not report it until 2022.

Erin testified that based on her knowledge as a nurse, she does not believe that Evans can sustainably work 40 hours a week. She believes the only way he could work a full-time job

is if the employer works with his limitations. She discussed observing some of these limitations, such as Evans' inability to sit for a long period of time and his occasional reliance on a back brace. When Evans and Erin travel, the drives are often extended because of the number of stops they must make for Evans. Erin explained that she based her opinion on witnessing Evans try to work at a restaurant in 2015 or 2016 and that since then, he has not attempted to work anywhere. Evans also testified he can still travel by car but cannot travel by plane because it disturbs his back too much.

Although Evans has difficulty traveling, he has traveled numerous times in recent years. He took his family to Colorado in 2020 twice for hiking and skiing, but the weather prevented them from skiing. He also took the children to "Lego Land and an aquarium" in Kansas City, Missouri. In 2021, he took his family to Texas.

*(ii) Evans' Education*

When trial commenced in March 2022, Evans was pursuing his master's degree in clinical counseling. By August, he was close to graduating once he concluded his final internship. He explained he chose to pursue this degree because it fit his personality and physical abilities. It would also allow him to set his own hours as a practitioner. He believes he can work if the position is not fulltime and would work with his limitations. He hopes that with his degree, he can begin working as a counselor in private practice.

As a part of his studies, Evans has worked multiple internships that have spanned 100 to 200 hours of work over a 12-week period. Additionally, he runs a men's therapy group on Tuesdays for 6 hours and a psychoeducation course on Wednesdays and Thursdays. While he does his internships, he is considered a full-time student. In total, he estimates he spends 18 hours a week at his internship sites and ½ hour to 1½ hours in the evening for his cohort class, which occurs once a week.

Despite Evans' strides in his education and his achievement of receiving his master's degree, he does not believe he will ever work a full-time job. In August 2022, Evans testified he had not been able to find an employer that would accommodate him; however, he admitted he had not applied for any jobs. Evans clarified that he calls employers first to see if they are willing to accommodate him, before he submits an application.

### (d) Ewing's Motion for Attorney Fees

Ewing testified on the final day of trial about the hardships Evans' litigation has caused her. In 2014, she filed an application to hold Evans in contempt for nonpayment of daycare costs. She filed another contempt action in 2016 for nonpayment of expenses, but the order was later vacated due to Evans' injury.

Evidence was admitted showing Erin made $112,482 in 2021, according to Evans' joint tax return. Ewing, on the other hand, testified she has averaged around $65,266 per year over the last several years. This total includes Ewing's working two jobs—a full-time job she works Monday through Friday and a part-time job she works on the weekend. She incurred over $18,000 in legal bills since Evans brought this action in March 2021. She contended that the case went on longer than it should and that this is not the first time she has incurred substantial legal bills to fight Evans' lawsuits.

### 3. District Court Overrules Evans' Motion for Custody Modification

The district court overruled Evans' complaint to modify. It found that Evans' status change from active military duty to honorably discharged was not a material change in circumstances. It summarized the evidence to be that while enlisted, Evans had made only two trips to Kansas, and that they were not overnight trips, so the traveling was not an impediment to his parenting time before or after the 2015 Order.

It also found unpersuasive Evans' argument that the child's behavior issues were a material change in circumstances. It notably found that the child's behavior seemed to be improving and that "an abundance of evidence indicated [the child's] behavioral struggles were most problematic in 2018 . . . and 2019." It concluded the child's behavior issues are being properly addressed and are diminishing; thus, a change in custody was unnecessary and could disrupt the child's structure and routine.

The district court found that barring the child from sweat lodges did not infringe on Evans' constitutional rights. It determined that the restriction was not preventing Evans from exposing the child to all Native American religious practices; rather, it was just barring Evans from taking the child into the sweat lodge. This restriction was in the child's best interests and was narrowly tailored, as the child can still be present at the sweat lodge and any other ceremony.

The district court concluded, however, that Ewing established a substantial and material change in circumstances warranting modification to the parenting plan. Specifically, it found that both fall break and Halloween should be eliminated from the parenting plan.

The district court modified Evans' child support obligation. It agreed with Ewing that Evans was capable of full-time work at minimum wage. It found that Evans was capable of earning at least $1,560 per month, and evidence showed that Evans' monthly disability pay through the military increased on December 1, 2021, by over $100.

Finally, the district court ordered Evans to pay Ewing's attorney fees in the full amount. It found Evans chose to file a complaint rather than engage in communication with school personnel, therapists, or even Ewing to resolve his issues. Evans appeals.

### III. ASSIGNMENTS OF ERROR

Evans assigns the district court abused its discretion (1) in not sustaining his request to modify custody, (2) in denying

his request to take the child to Native American sweat lodges, (3) by imputing income beyond his VA benefits, and (4) in awarding Ewing attorney fees.

## IV. STANDARD OF REVIEW

[1] Modification of a judgment or decree relating to child custody, visitation, or support is a matter entrusted to the discretion of the trial court, whose order is reviewed by an appellate court de novo on the record, and will be affirmed absent an abuse of discretion. *Lindblad v. Lindblad*, 309 Neb. 776, 962 N.W.2d 545 (2021).

In such de novo review, when the evidence is in conflict, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Von Tersch v. Von Tersch*, 235 Neb. 263, 455 N.W.2d 130 (1990).

[2] In an action for modification of a marital dissolution decree, the award of attorney fees is discretionary with the trial court, is reviewed de novo on the record, and will be affirmed in the absence of an abuse of discretion. *Tilson v. Tilson*, 307 Neb. 275, 948 N.W.2d 768 (2020).

## V. ANALYSIS

### 1. Child Custody Modification

Evans claims the district court abused its discretion in not granting his request to modify custody. His argument is two-fold. First, he argues the district court erred in determining that he failed to establish a material change in circumstances that would necessitate modification. Second, despite the district court's not analyzing whether it was in the child's best interests to modify the custody order, Evans argues this court should determine on de novo review that it is in the child's best interests to modify the custody order.

[3] Ordinarily, custody and parenting time of a minor child will not be modified unless there has been a material change in circumstances showing that the best interests of the child

require modification. *Lindblad v. Lindblad, supra*. Modifying a custody or parenting time order requires two steps of proof. *Id*. First, the party seeking modification must show by a preponderance of the evidence a material change in circumstances that has occurred after the entry of the previous custody order and that affects the best interests of the child. *Id*. Second, the party seeking modification must prove that changing the child's custody or parenting time is in the child's best interests. *Id*.

### (a) Material Change

In his appellate brief, Evans provided two material changes in circumstances that he argued merit a modification to the custody order: (1) At the issuance of the custody order, the district court did not anticipate Evans' health condition or ultimate discharge from the military, and (2) the child's behavior has worsened. However, during oral argument, counsel advised that Evans was abandoning his argument regarding the child's behavior because it has improved. Therefore, we address only the argument regarding Evans' health condition and discharge from the military as a potential material change in circumstances.

[4,5] A material change in circumstances is the occurrence of something which, had it been known to the dissolution court at the time of the initial decree or prior modification, would have persuaded the court to decree differently. *Lindblad v. Lindblad, supra*. Proof of a material change in circumstances is the threshold inquiry in a proceeding on a complaint to modify, because issues determined in the prior custody order are deemed preclusive in the absence of proof of new facts and circumstances. *Weaver v. Weaver*, 308 Neb. 373, 954 N.W.2d 619 (2021).

[6] The party seeking custody modification must show a material change in circumstances occurring after the entry of the previous custody order. *Jones v. Jones*, 305 Neb. 615, 941 N.W.2d 501 (2020). When a change in custody is to be

made, it should appear to the court that the material change in circumstances is more or less permanent or continuous and not merely transitory or temporary. *Id*. The rationale for limiting modifications of custody and parenting time to only those necessitated by a material change in circumstances is to avoid extensive and repetitive litigation and unnecessary, potentially harmful fluctuations in the child's life. *Lindblad v. Lindblad*, 309 Neb. 776, 962 N.W.2d 545 (2021). Simply put, a custody or parenting time order will not be modified absent proof of new facts and circumstances arising since the order was entered that affect the best interests of the child. *Id*.

Evans argues that because he is no longer an active member of the National Guard, has a 90-percent disability rating from the military, and is no longer subject to long periods of deployment or travel, he can now spend more time with the child, which he concludes is a material change in circumstances. He explains that he did not seek joint custody in 2015 because of his past travel with the National Guard and his belief he would return to active duty. Now, however, he believes he is unable to work, which gives him flexibility and additional time to spend with his son.

Evans failed to satisfy his burden of showing a material change in circumstances occurred since the entry of the 2015 Order. At the time of that order, Evans had already suffered the injuries that he now claims led to his discharge from the military. At that time, he was not being deployed throughout the state. And although Evans' argument is that he did not know at the time of the 2015 Order that he would be discharged from the military and thus would not be subject to long periods of deployment, he did not provide evidence that his prior travel impeded his being awarded joint custody of his son. We note that the district court's observation that Evans' travel with the National Guard consisted of 2-day trips to Kansas disregards his other travel throughout Nebraska; however, even considering this evidence, it does not lead us to conclude that Evans' travel impeded an award of joint

custody. He testified that he traveled often within the state, which included travel to western Nebraska and "[s]ometimes several overnights." He explained:

> So my travel time usually would be at least two or three days a week I would be traveling and then I'd spend some time in the office preparing more secure materials. And then I would also have to travel for training often to Arkansas or Georgia. Once every year or every other year.

Evans did not elaborate whether the weekly travel included overnights, or whether he was able to return home in the evenings. He described being away from Lincoln, Nebraska, "sometimes overnights." And although he identified his travel for training as occurring "often," he quantified it as "[o]nce every year or every other year." By his own admission, the out-of-state travel was infrequent.

The 2015 Order was based upon a stipulation of the parties. Given the testimony outlined above, we cannot find that the district court abused its discretion in determining that had it known Evans would be discharged from the military and no longer subject to deployment, it would have ordered joint custody when issuing the 2015 Order.

### (b) Best Interests

Because we find that Evans' alleged change in circumstances was not material, we need not address whether it would be in the child's best interests to modify the custody order. The proof of a material change in circumstances is the threshold inquiry in a proceeding on a complaint to modify. *Weaver v. Weaver*, 308 Neb. 373, 954 N.W.2d 619 (2021). A custody order will not be modified absent proof of new facts and circumstances arising since it was entered. *Id.*

### 2. Evans' Request to Take Child to Sweat Lodges

Evans argues the injunction barring the child from participating in sweat lodges violates his First Amendment rights.

He claims that the district court abused its discretion and infringed upon his constitutional rights, because Ewing failed to show that the practice "infringes on her religious beliefs and/or poses an immediate and substantial threat to [the child's] temporal well-being." Brief for appellant at 19.

[7] The First Amendment to the U.S. Constitution guarantees that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]" The Nebraska Constitution offers similar protections under article I, § 4. A parent has a constitutional right under the Free Exercise Clause of the First Amendment to exercise religious practices and spiritual beliefs with their child. See *LeDoux v. LeDoux*, 234 Neb. 479, 452 N.W.2d 1 (1990).

[8-10] Although the prohibition against infringement of religious belief is absolute, the immunity afforded religious practices by the First Amendment is not so rigid. *Peterson v. Peterson*, 239 Neb. 113, 474 N.W.2d 862 (1991). The paramount consideration in all cases involving the custody or visitation of a child is the best interests of that child. *LeDoux v. LeDoux, supra*. Thus, when a court finds that particular religious practices pose an immediate and substantial threat to a child's temporal well-being, a court may fashion an order aimed at protecting the child from that threat. *Peterson v. Peterson, supra*. In doing so, a court must narrowly tailor its order, so as to result in the least possible intrusion upon the constitutionally protected interests of the parent. *Id*.

Although there was testimony regarding prayer and spirituality related to the sweat lodge, based upon the record before us, we cannot determine that Evans' participation in the sweat lodge constitutes a religious practice. Evans is not an enrolled member of any tribe. He testified that he lives an "Indigenous life," which he defined as a "way of life." He wanted his son to experience the sweat lodge not only to learn more about Native American culture, but because he believed it taught self-control. By overcoming heat and darkness, he believed, his son would learn to listen and to be patient and still.

Testimony from other witnesses further negates the sweat lodge as a religious practice in this case. Roaneagle testified that people from all religions participate and need not be tribal members. Erin denied that religion was being practiced at the sweat lodge; rather, she described it as "part of the Native American culture." Having failed to establish that participation in the sweat lodge is a religious practice, we review the district court's order through a best interests analysis.

Here, the district court found that restricting the child's ability to use a sweat lodge was in his best interests. It heard conflicting testimony from each parent. Ewing testified that the sweat lodges posed a danger to the child. Evans testified that the sweat lodges could help the child spiritually, as well as help with his behavior issues. Erin, Evans' older daughter, and Roaneagle all testified that the child did not seem to be in distress when he participated in the sweat lodges. But neither parent confirmed with a healthcare professional whether the sweat lodges could adversely interact with the child's medication.

Although we review the record de novo for an abuse of discretion, appellate courts do not reweigh the credibility attributed to witnesses. See *Von Tersch v. Von Tersch*, 235 Neb. 263, 455 N.W.2d 130 (1990). The district court appears to have found persuasive Ewing's testimony that the sweat lodge is unsafe, as well as Evans' testimony that he has needed to exit a sweat lodge prior to the completion of the ceremony. Both Townsend and Ewing testified about the importance of routine for the child and how much transition can negatively impact the child's behaviors. The district court ultimately found Ewing's statements regarding the difficulties in maintaining this routine with the child after his attending a sweat lodge were persuasive.

Because the district court found Ewing's testimony persuasive that the sweat lodges posed a threat to the child's well-being, it determined it was in the child's best interests to

restrict his ability to enter the sweat lodge. We find no abuse of discretion in that decision.

## 3. CHILD SUPPORT

Evans argues that the evidence failed to demonstrate that he could work a full-time minimum-wage job and that thus, the district court abused its discretion in imputing income beyond his VA benefits.

[11] Child support payments should be set according to the Nebraska Child Support Guidelines. The guidelines provide that "[i]f applicable, earning capacity may be considered in lieu of a parent's actual, present income" and may include factors such as work history, education, occupational skills, and job opportunities. Neb. Ct. R. § 4-204(E) (rev. 2020). "Earning capacity is not limited to wage-earning capacity, but includes moneys available from all sources." *Id*. Use of earning capacity to calculate child support is useful "'when it appears that the parent is capable of earning more income than is presently being earned.'" *Freeman v. Groskopf*, 286 Neb. 713, 720, 838 N.W.2d 300, 307 (2013) (citing *Rauch v. Rauch*, 256 Neb. 257, 590 N.W.2d 170 (1999)). Generally, earning capacity should be used to determine a child support obligation only when there is evidence that the parent can realize that capacity through reasonable efforts. *Johnson v. Johnson*, 290 Neb. 838, 862 N.W.2d 740 (2015).

The district court found evidence that Evans had an earning capacity beyond what he is presently earning, which is only his VA disability benefits. Evans admits he is capable of working a job. He testified he could work at a job that met his limitations. Despite that belief, Evans has not applied for a job since he left his restaurant employment in 2015 or 2016. Evans' ability to work has changed since then, insofar as he testified that he participated in physical therapy off and on for 2½ years leading up to trial, meaning he started physical therapy roughly 3 years after working at the restaurant.

Since starting physical therapy, Evans has worked multiple internships, while attending school, in pursuit of his master's degree. He ran a men's therapy group and psychoeducation courses during the week. Evans testified he aspires to work and use his degree. When he applied for disability benefits, he was denied because he was told there were 15,000 jobs available that he could do. Evidence from trial shows that Evans is not incapable of work, and since he has failed to apply for any jobs since his last employment in 2015 or 2016, the evidence is insufficient to conclude he has made reasonable attempts to locate employment. When considering the work completed for his degree, the denial of his application for disability benefits, and the many trips Evans has participated in during the past few years, we cannot find that the district court abused its discretion in finding that Evans has a greater earning capacity than his monthly VA disability benefits.

### 4. Attorney Fees

[12-15] Attorney fees and expenses may be recovered only where provided for by statute or when a recognized and accepted uniform course of procedure has been to allow recovery of attorney fees. *Garza v. Garza*, 288 Neb. 213, 846 N.W.2d 626 (2014). Customarily, attorney fees are awarded only to prevailing parties or assessed against those who file frivolous suits. *Id*. A uniform course of procedure exists in Nebraska for the award of attorney fees in dissolution cases. *Id*. Thus, there was authority, in this modification of a dissolution decree case, for the awarding of attorney fees. *Id*. It has been held that in awarding attorney fees, a court shall consider the nature of the case, the amount involved in the controversy, the services actually performed, the results obtained, the length of time required for preparation and presentation of the case, the novelty and difficulty of the questions raised, and the customary charges of the bar for similar services. See *id*.

Here, Ewing prevailed on each issue raised by Evans and prevailed on the issues she raised, such as removing Halloween and fall break from the parenting plan. The district court acknowledged the relative economic circumstances of the parties, including that Evans has had free legal assistance in his past cases, yet Ewing has been responsible for her legal bills throughout the life of this case. Furthermore, it acknowledged that Ewing works a second job to help pay her legal fees. Overall, we cannot say the district court's order awarding Ewing attorney fees was an abuse of discretion.

## VI. CONCLUSION

For the foregoing reasons, we conclude that Evans failed to show a material change in circumstances occurred to necessitate a modification of child custody. The district court did not abuse its discretion in enjoining Evans from taking the parties' son into a sweat lodge, imputing income beyond Evans' VA disability benefits, and awarding attorney fees to Ewing. Therefore, we affirm.

Affirmed.