Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
05/08/2026 08:12 AM CDT

Libby A. Munsell, appellee, v.
Jacob L. Munsell, appellant.
___ N.W.3d ___

Filed May 8, 2026.    No. S-25-430.

1.  **Divorce: Child Custody: Child Support: Property Division: Alimony: Attorney Fees: Appeal and Error.** In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge in his or her determinations regarding custody, child support, division of property, alimony, and attorney fees.

2.  **Evidence: Appeal and Error.** In a review de novo on the record, an appellate court is required to make independent factual determinations based upon the record, and the court reaches its own independent conclusions with respect to the matters at issue.

3.  ____: ____. When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.

4.  **Judges: Words and Phrases.** A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.

5.  **Child Custody.** The paramount consideration in determining child custody is the best interests of the children.

6.  ____. Neb. Rev. Stat. § 43-2923 (Reissue 2016) of Nebraska's Parenting Act sets forth a nonexhaustive list of factors to be considered in determining the best interests of a child in regard to custody.

7.  ____. No single factor regarding child custody is determinative, and different factors may weigh more heavily in the court's analysis, depending on the evidence presented in each case.

8.  ____. Legal custody includes the right to make fundamental decisions regarding a child's religious upbringing.

9. ____. Legal custody typically includes the right to make decisions about extracurricular activities.
10. **Constitutional Law.** The Free Exercise Clause of the First Amendment protects the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through the performance of religious acts.
11. **Constitutional Law: Parental Rights.** Parents have the right to direct the religious upbringing of their children.
12. ____: ____. When a court finds that particular religious practices pose an immediate and substantial threat to a child's temporal well-being, a court may fashion an order aimed at protecting the child from that threat. In so doing, a court must narrowly tailor its order so as to result in the least possible intrusion upon the constitutionally protected interests of the parent.

Appeal from the District Court for Buffalo County: John H. Marsh, Judge. Affirmed as modified.

Jennifer N. Rowling, of Tye & Rowling, P.C., L.L.O., for appellant.

Bradley Holbrook and Samanth J. Merrill, of Jacobsen, Orr, Lindstrom & Holbrook, P.C., L.L.O., for appellee.

Funke, C.J., Cassel, Stacy, Papik, Freudenberg, Bergevin, and Vaughn, JJ.

Vaughn, J.

## I. INTRODUCTION

Jacob L. Munsell appeals from a decree of dissolution, arguing the trial court abused its discretion by placing legal custody of the parties' minor children with Libby A. Munsell and allowing Libby to decide whether Jacob could, during his parenting time, send the children to an overnight camp primarily supported by a religious organization (church camp). For the following reasons, we affirm as modified.

## II. BACKGROUND

Jacob and Libby married in 2010 and had two children, one born in 2016 and the second born in 2018. In February 2024, Libby filed a complaint seeking dissolution of the marriage.

The parties stipulated to the division of their property, and they agreed to share joint physical custody of the children under a rotating parenting schedule that gave each parent equal time. Trial was had on the contested issues of legal custody, the children's involvement in the church attended by Jacob (church), and the children's attendance at the church camp during Jacob's parenting time. Jacob appeals the district court's decision on legal custody and church camp attendance.

## 1. Legal Custody

At trial, Jacob testified that he and Libby agree on most things, that he wants to continue to be involved in raising the children, and that joint legal custody is best for the children. He also testified that although he had not been completely honest with Libby about a variety of things, he does not lie to her about the children.

Libby testified she has been involved with most of the children's "legal decisions" and, although she does not mind including Jacob in those decisions, her experience with Jacob causes her not to trust him with big decisions for the children. Specifically, evidence was adduced at trial that Jacob had not been truthful with Libby about his affair. Libby also testified that she has difficulties communicating with Jacob and that she is good at scheduling and organizing and believes she can provide more stability with "legal decisions."

In support of their respective arguments for legal custody, the parties' evidence focused primarily on the children's health care and religious upbringing, but evidence was also presented on the children's education and sports.

### (a) Children's Health Care

Jacob testified that Libby was the primary person handling the logistics of taking the children to medical, vision, and counseling appointments but that she included him in the majority of the health care decisions before she filed for dissolution. Jacob acknowledged that although he did attend some appointments, Libby or her mother took the children to

the majority of their appointments. Jacob testified it was Libby who determined the children should attend counseling and although he agreed they should go, he did not think continued counseling was necessary.

Libby testified that she took the initiative to schedule the appointments and that Jacob helped, but she does not think he cared as much about the appointments as she did. Libby also testified that one of their children had been diagnosed with attention deficit hyperactivity disorder (ADHD) and that she and Jacob disagreed on whether the child should take prescribed ADHD medication. To ensure the child receives the medication during Jacob's parenting time, Libby arranged to have a school nurse administer it during the school week.

### (b) Children's Education and Sports

Jacob testified he communicates with his children's teachers and has attended school meetings. Jacob also testified that he disagrees with Libby's decision not to enroll their youngest child in soccer. Libby testified that their youngest child no longer wanted to play soccer.

### (c) Children's Religion

Jacob and Libby were raised in the same religion as that of the church Jacob currently attends. Jacob testified the church follows the tenet that women should be "subservient" to men and that the church should be led by men. During their marriage, the parties and the children attended the church. However, Libby testified that she "left the church" about 5 months before filing for divorce, no longer agreed with some of the church's teachings, and did not like that there were "no women leaders and wom[e]n were silenced and subjugated." She also testified that she did not like the "culture of fear and shame that the church brings on, fear of hell and fear of punishment." After the parties separated, the children continued to attend the church with Jacob during his parenting time, and Libby initially supported this practice. At trial, however, the

parties disagreed on whether the children should continue to attend the church.

## 2. Church Camp Attendance

The district court heard testimony regarding the church camp from both parties and from a church camp director.

The director testified campers rotate through four classes that are each 30 to 45 minutes long and consist of a Bible class, as well as "crafts[,] activities[,] and nature" with five classes in a full weeklong session. The Bible class usually follows a vacation Bible school curriculum with a rotating religious theme. There is a main Bible verse for the church camp, and Bible class time is spent learning the verse, usually doing a coloring sheet, and completing a quick Bible "devote." Campers do not have to be affiliated with any religious organization to attend the church camp. The primary focus is on having fun, making friends, and being independent.

Jacob's parents live on the church camp's property as caretakers. Jacob testified the church camp was a "huge part" of his life, he had been a camp counselor, and he was currently serving on the church camp's board of directors. He testified the church camp was a place he went to "figure out what [he] believed" and "who [he] wanted to be" away from his parents and is something he wants his children to experience. He testified he met Libby at the church camp, and he admitted that after they began dating, they were sexually intimate on the church camp's property in violation of the church camp rules. But there was no evidence that the church camp's staff or directors were aware of, or sanctioned, such activity. Jacob also testified that these relations took place only while Libby attended as a staff member and not during a church camp session.

Libby began dating Jacob when she was age 16 and he was age 23. Libby testified that they had an intimate relationship by the following summer. Libby testified she enjoyed attending the church camp as a child but now believes the church

camp, like the church, teaches lack of self-worth, and she does not want the children to attend the church camp, even during Jacob's parenting time. She did not object, however, to the children attending a nonchurch camp. She admitted that the children enjoy being outdoors and that they have spent a considerable amount of time at the church camp because their grandparents reside on the property. Libby also admitted that when Jacob signed up their older child to attend the church camp during his parenting time in 2024, Libby did not take any steps to prevent the child from attending. However, she also testified that all but one of the overnight stays were spent in Jacob's parents' residence, instead of the cabins.

### 3. Parties' Positions at Trial

At the conclusion of the evidence, Libby requested sole legal custody and asked the court to restrict Jacob from taking the children to church, or enrolling them in the church camp, during his parenting time.

Jacob requested joint legal custody and opposed any restrictions on church and church camp attendance during his parenting time.

### 4. District Court's Decree

The district court's decree awarded Libby sole legal custody of the children, reasoning that she appeared to have been the parent primarily responsible for handling the medical, dental, and counseling appointments, as well as most of the educational matters. The court went on to state that Libby appeared to be resentful and distrusting of Jacob, to a large degree due to his affair and his dishonesty about it. The court noted that although the parties managed to agree on most matters affecting the children, there was considerable disagreement about religion, and that it could not find joint legal custody was in the best interests of the children.

The district court found "little or no evidence" Jacob's religious practice presented any threat of harm to the minor children's well-being and that the record did not support

restricting his ability to discuss his beliefs and involve the children in church activities during his parenting time.

As to the church camp, the district court found it "akin to the sweat lodge activity" found not to be a religious practice in *Ewing v. Evans*, 32 Neb. App. 531, 1 N.W.3d 571 (2023). Specifically, the district court stated that the church camp, while associated with the church, is not in itself a religious practice and that Libby, as the parent with legal custody, may determine the children's attendance at the church camp in the same manner as she can determine the children's attendance in any other extracurricular activity. Jacob appeals.

## III. ASSIGNMENTS OF ERROR

Jacob assigns, restated, that the district court erred by (1) granting Libby sole legal custody of the children and (2) denying him the ability to enroll the children in the church camp during his parenting time.

## IV. STANDARD OF REVIEW

[1] In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge in his or her determinations regarding custody, child support, division of property, alimony, and attorney fees. *White v. White*, 320 Neb. 256, 26 N.W.3d 924 (2025).

[2,3] In a review de novo on the record, an appellate court is required to make independent factual determinations based upon the record, and the court reaches its own independent conclusions with respect to the matters at issue. *Eis v. Eis*, 310 Neb. 243, 965 N.W.2d 19 (2021). When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Kauk v. Kauk*, 310 Neb. 329, 966 N.W.2d 45 (2021).

[4] A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a

litigant of a substantial right and denying just results in matters submitted for disposition. *Eis, supra*.

## V. ANALYSIS

### 1. Legal Custody

In his first assignment of error, Jacob claims the district court abused its discretion in granting Libby sole legal custody. Before addressing the parties' arguments, we recall the principles that govern custody determinations.

#### (a) General Custody Principles

[5] The standard for child custody has been settled. The paramount consideration in determining child custody is the best interests of the children. *Donald v. Donald*, 296 Neb. 123, 892 N.W.2d 100 (2017).

[6] Neb. Rev. Stat. § 43-2923 (Reissue 2016) of Nebraska's Parenting Act sets forth a nonexhaustive list of factors to be considered in determining the best interests of a child in regard to custody. *Scott v. Scott*, 319 Neb. 877, 25 N.W.3d 439 (2025). Such factors include, but are not limited to, the relationship of the minor child to each parent; the desires and wishes of the child if of an age of comprehension and based on sound reasoning; the general health, welfare, and social behavior of the child; credible evidence of abuse inflicted on any family or household member; and credible evidence of child abuse or neglect or domestic intimate partner abuse. See § 43-2923.

[7] In addition to the "best interests" factors listed in § 43-2923, a court making a child custody determination may also consider matters such as the moral fitness of the child's parents, including the parents' sexual conduct; respective environments offered by each parent; the emotional relationship between child and parents; the age, sex, and health of the child and parents; the effect on the child as the result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and the parental

capacity to provide physical care and satisfy the educational needs of the child. *Scott, supra*. Stability in the child's routine and minimalization of contact and conflict between the parents are also relevant considerations. See *Jones v. Jones*, 305 Neb. 615, 941 N.W.2d 501 (2020). No single factor is determinative, and different factors may weigh more heavily in the court's analysis, depending on the evidence presented in each case. *Id.*

(b) Application

The district court did not exhaustively discuss the various factors bearing on best interests, but it made an express finding that joint legal custody was not in the best interests of the minor children, and it therefore placed sole legal custody with Libby and emphasized that she had been the parent primarily responsible for handling the children's medical, dental, and counseling appointments and "most of the educational matters as well."

In arguing this was an abuse of discretion, Jacob points to evidence in the record that is favorable to him. This evidence generally concerns the children's good relationship with Jacob; his ability to provide for the children's health, welfare, and social behavior and his involvement in decisions related to the same; the ability of the parties to communicate and make joint decisions on most matters; his honesty in communications to Libby related to the children; his steps taken to facilitate a coparenting relationship with Libby; and the coparenting requirements under the partial parenting plan agreed to by the parties.

Additional evidence provides a more complete picture. Libby testified she is good at "being there" for the children, physically and emotionally. The children are in good health and have been provided with resources such as counseling to ensure appropriate social behavior and well-being. There was evidence that one of the children was provided ADHD medication, which Libby testified was "pretty much" initiated by

her. There was also undisputed evidence that Libby was more involved in the coordination and execution of the children's health care. The evidence supports the trial court's finding that Libby was the parent primarily responsible for handling the health care needs of the children.

There was also evidence presented that while the parties agree on many issues regarding the children, they do not agree on all issues. Specific disagreements were noted with respect to participation in soccer, continued counseling, and ADHD medication, and the court found "considerable disagreement about religion." There was further evidence presented that even though Libby does not trust Jacob, Libby still involved him in the many decisions related to the children and communicated with him about the children, despite having temporary sole legal custody.

In determining legal custody, the district court heard this evidence, observed the witnesses, and ultimately concluded that sole legal custody should be placed with Libby because joint legal custody would not be in the children's best interests. Having reviewed the record de novo, we find ample evidence that the district court's award of sole legal custody to Libby was in the children's best interests and cannot say the district court abused its discretion in awarding her sole legal custody. Thus, we affirm the district court's grant of sole legal custody to Libby.

## 2. Church Camp Attendance

In Jacob's second assignment of error, he contends the trial court abused its discretion by denying his "constitutionally protected right to enroll the [c]hildren in [c]hurch [c]amp" during his parenting time. As phrased, we believe this assignment misstates the trial court's ruling.

We do not read the language of the decree to impose a blanket prohibition on Jacob's ability to enroll the children in the church camp during his parenting time. Instead, the decree states that because Libby was awarded sole legal custody of

the children, she had the authority to decide whether the children should attend the church camp, even during Jacob's parenting time. The record makes clear that, at least at the time of trial, Libby was not inclined to allow the children to attend the church camp. So, the narrow question presented in this appeal is whether it was an abuse of discretion to allow Libby, as the sole legal custodian, to prevent Jacob from enrolling the children in the church camp during his parenting time.

To analyze this issue, we first recall the rights and responsibilities that accompany legal custody of a child. We then review the constitutionally protected right of fit parents to guide their children's religious upbringing. And finally, we consider the framework that dissolution courts have established to address conflict between a custodial parent's right to make fundamental decisions about a child's religious upbringing and a noncustodial parent's fundamental right to share their religious beliefs and practices with their children during their parenting time. Hereinafter, when we use the terms "custodial" and "noncustodial," we are referencing legal custody unless otherwise specified.

### (a) Legal Custody Rights

[8,9] Under Nebraska's Parenting Act, "[l]egal custody" is defined as "the authority and responsibility for making fundamental decisions regarding the child's welfare, including choices regarding education and health." Neb. Rev. Stat. § 43-2922(13) (Cum. Supp. 2024). It is well-settled in our case law that legal custody includes the right to make fundamental decisions regarding a child's religious upbringing. See *State on behalf of Kaaden S. v. Jeffery T.*, 303 Neb. 933, 932 N.W.2d 692 (2019) (legal custody includes fundamental decisions about child's welfare, education, health, and religious upbringing); *Goodman v. Goodman*, 180 Neb. 83, 88, 141 N.W.2d 445, 449 (1966) (legal custodian normally has "the right to control the religious training of the child"). Legal custody also typically includes the right to make decisions about

extracurricular activities. See *Avery v. Whittle*, 34 Neb. App. 126, ___ N.W.3d ___ (2026).

Thus, Libby, as the sole legal custodian, has the authority and responsibility under state law to make fundamental decisions regarding the children's education and welfare, including their religious education and their extracurricular activities. But our analysis does not end there, because fit parents—whether married or not—have fundamental constitutional rights to direct the religious upbringing of their child.

### (b) Parental Rights

The Free Exercise Clause of the First Amendment to the U.S. Constitution guarantees that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." That restriction applies equally to the states by way of the 14th Amendment. See *Cantwell v. Connecticut*, 310 U.S. 296, 60 S. Ct. 900, 84 L. Ed. 1213 (1940). The Nebraska Constitution offers similar protections under article I, § 4.

[10] The Free Exercise Clause of the First Amendment protects the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through the performance of religious acts. *Mahmoud v. Taylor*, 606 U.S. 522, 145 S. Ct. 2332, 222 L. Ed. 2d 695 (2025). For many people, "there are few religious acts more important than the religious education of their children." *Id.*, 606 U.S. at 547. "The practice of educating one's children in one's religious beliefs, like all religious acts and practices, receives a generous measure of protection from our Constitution." *Id*.

[11] The U.S. Supreme Court has "'long recognized the rights of parents to direct "the religious upbringing" of their children.'" *Id.* (quoting *Espinoza v. Montana Dept. of Revenue*, 591 U.S. 464, 140 S. Ct. 2246, 207 L. Ed. 2d 679 (2020)). Thus, both Jacob and Libby have a fundamental constitutional right to influence the religious upbringing of their children during their parenting time.

#### (c) Balancing These Rights

As this appeal illustrates, the state-law right of a legal custodian to make fundamental decisions about a child's educational and religious upbringing can conflict with the noncustodial parent's fundamental right to influence the religious upbringing of the child during his or her parenting time. The U.S. Supreme Court has not weighed in on the difficult question of how to properly balance these conflicting rights in the context of divorce proceedings, particularly where divorcing parents disagree about their child's religious upbringing. But it has noted generally that "the power of the parent, even when linked to a free exercise claim, may be subject to limitation . . . if it appears that parental decisions will jeopardize the health or safety of the child." *Wisconsin v. Yoder*, 406 U.S. 205, 233-34, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972).

Additionally, several state courts, including this one, have weighed in on the issue. As we discuss next, most have generally concluded that, absent a clear showing of substantial harm to the child, the noncustodial parent retains his or her fundamental right to direct the child's religious upbringing during his or her parenting time.

#### (i) Nebraska Precedent

Sixty years ago, this court questioned whether "even a noncustodial parent might legally be, or should be, enjoined from imparting religious instruction to his child in the absence of a showing of serious threat to the health or well-being of the child." *Goodman v. Goodman*, 180 Neb. 83, 89, 141 N.W.2d 445, 449 (1966). We effectively answered that question 24 years later in *LeDoux v. LeDoux*, 234 Neb. 479, 452 N.W.2d 1 (1990).

In *LeDoux*, a noncustodial father appealed a dissolution decree that ordered him to refrain from exposing, or permitting any other person to expose, his minor children to any religious practices or teachings inconsistent with the religion practiced by the custodial mother. The father argued that

the decree impermissibly restricted his rights under the Free Exercise Clause of the First Amendment to share his religious beliefs and practices with the minor children during his visitation.

[12] This court noted that when making decisions about child custody and visitation, the court's paramount consideration is the best interests of the child, and it announced the rule that

> when a court finds that particular religious practices pose an immediate and substantial threat to a child's temporal well-being, a court may fashion an order aimed at protecting the child from that threat. [Citations omitted.] In so doing, a court must narrowly tailor its order so as to result in the least possible intrusion upon the constitutionally protected interests of the parent.

*LeDoux*, 234 Neb. at 486, 452 N.W.2d at 5. In *LeDoux*, this court affirmed the decree, reasoning that there was sufficient evidence in the record to support the trial court's finding that the parents' religious differences had caused at least one of the children to experience significant stress that detrimentally affected his well-being, and we concluded that the restriction limiting the father's right to discuss his religious beliefs with the children was narrowly tailored in that it still permitted him to discuss those religious beliefs that were common to both parents' faiths. Although the dissenting opinion in *LeDoux* disagreed that the evidence proved a substantial threat to the children's well-being sufficient to restrict the father's religious freedom, it did not quarrel with the rule announced by the *LeDoux* majority.

### (ii) Other Jurisdictions

Other states have adopted similar rules when seeking to balance the conflicting rights of custodial and noncustodial parents in this context. For instance, in *In re Marriage of Murga*, 103 Cal. App. 3d 498, 504-05, 163 Cal. Rptr. 79, 82 (1980), the California appellate court noted:

[I]n the majority of American jurisdictions that have considered the question, the courts have refused to restrain the noncustodial parent from exposing the minor child to his or her religious beliefs and practices, absent a clear, affirmative showing that these religious activities will be harmful to the child.

The court in *In re Marriage of Murga* then announced the following rule:

[W]hile the custodial parent undoubtedly has the right to make ultimate decisions concerning the child's religious upbringing, a court will not enjoin the noncustodial parent from discussing religion with the child or involving the child in his or her religious activities in the absence of a showing that the child will be thereby harmed.

103 Cal. App. 3d at 505, 163 Cal. Rptr. at 82. The court noted this rule was consistent with the principle that custody decisions "will not be governed by the religious tenets or practices of parents absent a clear showing that the parent's religious practices would be harmful to the child." *Id.*

In *Munoz v. Munoz*, 79 Wash. 2d 810, 813, 489 P.2d 1133, 1135 (1971), the Supreme Court of Washington concluded:

[It] appears to be well established that the courts should maintain an attitude of strict impartiality between religions and should not disqualify any applicant for custody or restrain any person having custody or visitation rights from taking the children to a particular church, except where there is a clear and affirmative showing that the conflicting religious beliefs affect the general welfare of the child.

And in *In re Marriage of Minix*, 344 Ill. App. 3d 801, 801 N.E.2d 1201, 280 Ill. Dec. 256 (2003), the Illinois appellate court addressed how to balance a custodial parent's statutory right to control the religious upbringing of a child with the noncustodial parent's statutory right to uninterrupted and unrestricted visitation with the child and the constitutional right to the free exercise of religion. Like the court in *In re*

*Marriage of Murga*, the court in *In re Marriage of Minix* observed that most courts "have refused to restrain the non-custodial parent from exposing the child to his or her religious beliefs and practices absent a clear, affirmative showing that those religious activities would be harmful to the child." 344 Ill. App. 3d at 806, 801 N.E.2d at 1204, 280 Ill. Dec. at 259. The court in *In re Marriage of Minix* thus announced a rule that "[a]bsent proof of harm or that attendance at religious services with the noncustodial parent somehow interferes with the custodial parent's selection of the child's religion, the noncustodial parent is entitled to his or her visitation period without interference from the custodial parent . . . ." 344 Ill. App. 3d at 809, 801 N.E.2d at 1207, 280 Ill. Dec. at 262.

The rules discussed above, like the rule announced in *LeDoux v. LeDoux*, 234 Neb. 479, 452 N.W.2d 1 (1990), come into play where the dissolution court is called upon to resolve conflict between the recognized rights of custodial and noncustodial parents as it regards their children's religious upbringing. In the absence of such conflict, this court has long recognized the importance of preserving an attitude of impartiality between religions, particularly where there is no showing that religious beliefs, or the conflict between them, seriously threatens the health or well-being of the child. See *Goodman v. Goodman*, 180 Neb. 83, 141 N.W.2d 445 (1966).

With this framework in mind, we turn to Jacob's argument that the trial court abused its discretion by allowing Libby to determine whether he could enroll the children in the church camp during his parenting time.

### (d) Analysis

We begin by noting that the trial court properly recognized that Libby's right as the legal custodian conflicted with Jacob's fundamental right to continue to influence the religious upbringing of the children during his parenting time and that it applied the rule from *LeDoux* to resolve that conflict.

In doing so, the court expressly found that "there is little or no evidence that [Jacob's] religious practice presents any threat to the children's well-being." The court thus concluded that "[t]he record does not support any restriction on [Jacob's] ability to discuss his beliefs and involve the children in church activities during his parenting time." No one has appealed this finding, and our de novo review persuades us that it is amply supported by the record.

But this leaves the question of whether the trial court erred by allowing Libby the unilateral authority to decide whether the children could attend the church camp during Jacob's parenting time. The trial court decided this issue by analyzing whether the church camp was properly characterized as a religious practice or instead was an "extracurricular activity" that the parent with legal custody had authority to determine. On this record, we do not think such an analysis was necessary.

Here, there was no dispute that the church camp was supported by the same religious organization that encompassed Jacob's church and included religious education; indeed, Libby's primary objection to the children's attendance was the church camp's religious affiliation. She had no objection to the children attending a nonchurch camp, so the basis for her objection was not the extracurricular activities in which they would participate at the church camp, but the religious activities in which they would participate. In other words, although the church camp included a mix of religious activities and extracurricular activities, it was not necessary to determine which activity predominated the daily camp schedule, because the evidence showed that both parties considered the church camp to be a "church activity." Neither do we see evidence that allowing the children to attend the church camp would expose the children to harm. The trial court made an express factual finding that the record did not support placing any restriction on Jacob's ability to involve the children in "church activities during his parenting time," and our review of the record confirms the same. For similar reasons, in our de novo

review, we see an absence of evidence that allowing the children to attend the church camp would pose "an immediate and substantial threat to a child's temporal well-being." *LeDoux*, 234 Neb. at 486, 452 N.W.2d at 5.

Accordingly, we see no basis to restrict Jacob's ability to enroll the children in the church camp during his parenting time. We therefore modify the decree to remove the provision that allowed Libby to determine whether Jacob could enroll the children in the church camp during his parenting time.

Given this modification, we do not reach Jacob's alternative argument that any restriction on church camp attendance was an abuse of discretion because it was not in the children's best interests.

## VI. CONCLUSION

For the foregoing reasons, the decree of dissolution of marriage shall be modified as provided herein, and we affirm the judgment of the district court as modified.

Affirmed as modified.